BURKE P., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–12347.

Supreme Court of Alaska.

June 29, 2007.

Rehearing Denied July 17, 2007.*

---

* MATTHEWS, Justice, with whom BRYNER, Justice, joins, dissenting.

Alan L. Schmitt, Jamin Schmitt St. John, Kodiak, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, and Craig J. Tillery, Acting Attorney General, Anchorage, for Appellee.

Jill C. Wittenbrader, Assistant Public Advocate, and Joshua P. Fink, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I.  INTRODUCTION

A father challenges the superior court's decision to terminate his parental rights, arguing that his child was not in need of aid and that the state did not make reasonable

efforts to reunify his family. He also contends that the superior court should have ordered post-termination visitation. We affirm the superior court's decision in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

The father, Burke,[1] was born in Laos in 1958 and came to the United States as a refugee in 1979. During the period of time relevant to this case, he lived in Kodiak with Sondra.[2] Sondra suffers from mild mental retardation and schizophrenia. Burke and Sondra raised four children, Billy (age eleven), Beau (age eight), Alec (age six), and Jesse (age four).[3] Because Burke was often away from the home (both at work and at play), Sondra served as the primary caregiver for all four children. Burke also visited Laos or Thailand for approximately one month almost every year, leaving Sondra to act as the children's sole caregiver during those absences.

The Office of Children's Services (OCS) first became involved with the family in March 2000. Sondra gave birth to Alec prematurely while Burke was in Laos, leaving no one to care for Billy and Beau. OCS took Billy and Beau into protective custody, but dismissed the child in need of aid (CINA) petition when Burke returned to Kodiak about two weeks later.

The next period of OCS's involvement began in December 2001 and lasted until September 2004. In December 2001, while Burke was again in Laos, OCS removed Billy, Beau, and Alec after Sondra had a psychotic episode that rendered her unable to care for the children.[4] After Burke returned several weeks later, he and Sondra stipulated that the children were in need of aid and OCS commenced reunification efforts.

As part of its reunification efforts, OCS established goals that needed to be met before reunification could occur. These goals included "stabiliz[ing] the relationship" between Burke and Sondra in order to provide a safe environment for the children and "plan[ning] appropriate activities for the children during visitation." OCS referred Burke and Sondra to a variety of support services to help them meet those goals. Burke was referred to parenting classes, individual counseling, and couples counseling. Burke and Sondra enrolled in couples counseling, but it was discontinued because Burke either dominated the sessions or failed to attend them. It is not clear whether Burke enrolled in individual counseling, but he did complete parenting classes. Janet Brenteson, the social worker in charge of the CINA case, stated that Burke "did not seem to engage in the counseling process."

OCS initially arranged for supervised visitation, but later allowed home visits between Sondra and Burke and their three children. During some of these home visits, Sondra physically abused the children. In April 2002, for instance, Sondra purposefully burned Alec's arm with the end of a butane candle lighter. Sondra hit the children regularly, often without explanation. After learning about Sondra's tendency to physically abuse her children, social service providers worked with her to improve her parenting skills.

In October 2002 Jesse was born. He lived with his parents, despite the fact that his three older brothers were in foster care. During much of the time that Jesse was living at home, Sondra received intensive assistance from various service providers in connection with the ongoing CINA case.

In May 2004, primarily because Sondra made significant progress improving her parenting skills, OCS placed Billy, Beau, and Alec back in Sondra's and Burke's care for a trial home visit. The trial visitation period went well and in September 2004 OCS moved to dismiss the CINA case.

---

1. Pseudonyms have been used to protect the privacy of the parties.

2. Sondra is not a party to this appeal.

3. Burke is not Billy's biological father, but has acted as his parent and is considered Billy's psychological father. Burke is the biological father of the other three children.

4. Jesse was not born until October 2002.

The third period of OCS involvement began only three months after the previous CINA case had been dismissed. In December 2004 OCS removed all four children from the home after receiving reports that Sondra had physically abused them. Sondra had kicked Alec in the face, bit Beau on the face, and spanked Jesse with a wooden spoon on his bare bottom. Burke was not alleged to have physically abused any of the children. However, the record shows that Burke consistently failed to intervene on his children's behalf when Sondra became upset with them and Burke testified that he was unaware of Sondra's tendency to physically abuse the children.

OCS began supervised visitation after removing the children from their home. Home visits were not permitted because the two older children stated that they were afraid of their parents. Burke attended almost all of the scheduled visits, but was not always actively involved in them. Brenteson testified that during the supervised visits "Burke interacted very little with the children.... That's been his behavior throughout visitation." The possibility of home visits was further dampened by the fact that Burke and Sondra denied Brenteson access to their home to assess the conditions inside. In an effort to promote contact between Burke and his children, OCS arranged for regular telephonic visitation, but Burke called only twice.

OCS did not finalize its case plan for Burke until June 2005. The case plan identified two primary goals: improving Burke's parenting skills and developing and sustaining Burke's interpersonal relationships with his children. The case plan did not refer Burke to service providers to help him achieve these goals.

In September 2005 the parties agreed to retain Dr. Susan LaGrande to conduct a psychological evaluation regarding the family's strengths and weaknesses, including Burke's role, and to issue a report that OCS could use to guide its permanency goals and service referrals. Dr. LaGrande's evaluation was critical of Burke. She observed that "[b]ecause [Burke] places responsibility for the problems in the family on Sondra, he takes the position that he is blameless, and does not take responsibility regarding how his actions have negatively impacted his children." Dr. LaGrande concluded that "Burke ... believes he understands what is best for his family[,] making it more difficult to recommend services. With such a perspective it is unlikely that he would benefit from services."

## B. Proceedings

OCS petitioned to terminate Burke's parental rights in November 2005.[5] The superior court held a termination hearing in May 2006 and concluded that Burke's parental rights should be terminated. The court concluded that the state had established by clear and convincing evidence that all four children were children in need of aid. The state had also shown that OCS had made "timely, reasonable efforts to provide family support services to the children." The court held that termination of Burke's parental rights was in the children's best interests and declined to order post-termination visitation.

Burke appeals, but limits his appeal to the termination of his parental rights concerning his youngest son, Jesse, and the lack of post-termination visitation with all three of his biological children.

## III. STANDARD OF REVIEW

■■■ In a CINA case "we will affirm the superior court's factual findings so long as they are not clearly erroneous."[6] A finding is clearly erroneous only if our review of the entire record leaves us "with a definite and firm conviction that the superior court made a mistake."[7] Whether the superior court's factual findings comport with the require-

---

**5.** At the same time OCS also sought termination of Sondra's parental rights.

**6.** *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004) (quoting *Brynna B. v. State, Dep't* of Health & Soc. Servs., 88 P.3d 527, 529 (Alaska 2004)).

**7.** *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001).

ments of the CINA statutes is a question of law that we review *de novo.*[8]

## IV. DISCUSSION

To terminate parental rights, the superior court must make three findings by clear and convincing evidence.[9] First, the court must find that the child "has been subjected to conduct or conditions" that establish that the child is in need of aid.[10] Second, there must be a finding that the parent has failed, within a reasonable time, to remedy the conditions that pose a danger to the child.[11] Third, the court must find that OCS made reasonable efforts to promote reunification.[12]

Burke attacks the first and third of these required findings, arguing that the superior court abused its discretion in finding that Jesse was a child in need of aid and contending that OCS's reunification efforts were unreasonable as a matter of law. Additionally, Burke suggests that the superior court should have ordered post-termination visitation between him and his children. We address each of these arguments in turn.

### A. The Superior Court Properly Found That Jesse Was in Need of Aid.

■ The superior court found that Jesse was a child in need of aid under four separate statutory provisions. The court found (1) that Jesse was subject to substantial physical harm or a substantial risk of suffering physical harm;[13] (2) that Jesse suffered mental injuries;[14] (3) that Jesse had been neglected;[15] and (4) that Sondra suffered from a mental illness that placed Jesse at a substantial risk of physical harm or mental injury.[16]

A child may be in need of aid where "the child has suffered substantial physical harm, or there is a substantial risk that the child will suffer substantial physical harm, as a result of conduct by or conditions created by the child's parent ... or by the failure of the parent ... to supervise the child adequately."[17] The superior court made the following findings regarding actual physical harm and the threat of physical harm:

There is no serious question that Sondra has physically abused the boys over the period from 2001–2004. She burned Alec's arm with a lighter. She spanked all four boys with a wooden spoon and a suitcase strap. She hit Billy over the head with a broom stick. She kissed and sucked on Alec and Beau so hard that it raised bruises on their faces. She also kicked Alec in the face raising bruises and injuries inside and outside his cheek. There remains considerable risk that she would injure the children, either intentionally or accidentally, if they were returned to her care.

Addressing Burke's lack of involvement with his family, the court found that Burke had "never exhibited the experience, ability or inclination to be the primary care taker for the boys."

Burke challenges the superior court's findings about harm or risk of harm by arguing that Jesse was not subject to anything beyond permissible corporal discipline. Burke also argues that the superior court erred as a matter of law in concluding that Jesse was at risk of suffering substantial physical harm, but provides little support for this argument. The state contends that the risk of harm that Jesse would face if returned home is well documented in the record.

Although the record may not show that Jesse suffered substantial physical harm, there is ample evidence to support the superior court's finding that Jesse *risked* substantial harm if returned home. The record contains evidence documenting Sondra's past physical abuse, which for the couple's three

8. *Carl N.,* 102 P.3d at 935.

9. AS 47.10.088(a).

10. AS 47.10.088(a)(1).

11. AS 47.10.088(a)(2)(A)-(B).

12. AS 47.10.088(a)(3).

13. *See* AS 47.10.011(6).

14. *See* AS 47.10.011(8).

15. *See* AS 47.10.011(9).

16. *See* AS 47.10.011(11).

17. AS 47.10.011(6).

older children went well beyond corporal discipline.[18] In 2002 she branded her son Alec on the arm with a lighter, in 2004 she kicked Alec in the face and bit Beau on the face. That this abuse was not isolated is evidenced by several other incidents of abuse.

Sondra's abusive behavior was also likely to continue. Social worker Brenteson testified that although Sondra had made progress in parenting classes between 2001 and 2004, she believed that Sondra was still unable to use appropriate disciplinary techniques. The timing of the December 2004 incident of physical abuse, which occurred only days after Sondra's primary service provider was forced to temporarily suspend in-home assistance, shows that even after over two years of parenting support services Sondra continued to resort to physical abuse when she felt unable to control her children.

The record shows that Burke did not prevent the abuse and his lack of involvement as a parent often exacerbated Sondra's abusive behavior. Burke testified that he did not notice Sondra's physical abuse of the children; he also failed to intervene on the children's behalf when Sondra became upset with them. Further, Burke traveled to Laos and Thailand for frequent visits lasting a month or more, leaving Sondra alone to care for the children. When he was not traveling or working, Burke often played cards with friends instead of spending time at home with his children and Sondra. These absences from the home put substantial stress on Sondra, which on occasion led her to physically abuse the children. Dr. La-Grande's conclusion that Burke was "a father who claims he is the mainstay of the family but through his actions demonstrates ne-

glectful and non-engaged behaviors" supports the conclusion that Burke would not have prevented Sondra from harming Jesse if Jesse were returned home.

In sum, the superior court's findings that Jesse was a child in need of aid because he faced a substantial harm if he returned home are well supported by the record. These findings are sufficient to establish that Jesse was a child in need of aid under AS 47.10.011(6).[19] As we conclude that the superior court correctly determined that Jesse faced a substantial risk of injury if he were returned home, we need not address Burke's challenges to the superior court's other grounds for concluding that Jesse was a child in need of aid.[20]

**B. The Superior Court Did Not Err in Concluding That OCS's Reunification Efforts Were Reasonable.**

■ Burke next argues that OCS's reunification efforts were unreasonable as a matter of law. He argues that the case plan that OCS prepared for him after the December 2004 removal was late and substantively deficient due to its failure to refer him to any remedial services. The state suggests that when viewed in the context of OCS's previous reunification efforts and Burke's failure to cooperate with OCS's prior referrals, OCS's efforts after December 2004 were reasonable. Although the reunification efforts here present an extremely close case, we agree with the state and affirm the superior court's conclusion that OCS's efforts were reasonable.

■ When interpreting what types of reunification efforts are required under AS 47.10.086(a),[21] we have stated that OCS must

---

**18.** *See In re D.C.*, 596 P.2d 22, 23 (Alaska 1979) (holding that discretion allotted to parents in administration of punishment "is not unlimited").

**19.** *See* 6 Arnold H. Rutkin, Family Law and Practice § 64.11[2] (2005) ("The rights of a parent who allows the other parent ... physically to abuse the child may also be terminated for failing to protect the child.").

**20.** *See Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 956 (Alaska 2005) (noting that it is unnecessary to consider other findings where

one ground for finding child to be in need of aid is supported by record).

**21.** AS 47.10.086(a) provides:

(a) Except as provided in (b) and (c) of this section, the department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

provide a parent with a "reasonable opportunity ... to remedy the behavior that caused his [or her] children to be in need of aid."[22] In determining whether reunification efforts during a specific time period were reasonable, we look at the entire history of the services that OCS has provided a parent[23] as well as the parent's level of cooperation with OCS's efforts.[24]

Our starting point for evaluating OCS's reunification efforts is the identification of the problems that caused the child or children to be in need of aid. Here, Burke's lack of engagement with his family helped to cause the conditions that left Jesse in need of aid. Burke's frequent absences from the home meant Sondra had to parent the couple's four children on her own, which, because of her mental problems, she was largely incapable of doing without resorting to physical abuse. When Burke was at home, he was not supportive of Sondra and rarely interacted with his children in a meaningful way. Sondra's ability to parent without resorting to physical abuse was thus negatively affected by Burke's lack of involvement. Importantly, Burke's disengagement from his family was the same problem that OCS attempted to address between December 2001 and September 2004 as part of its earlier reunification efforts.

The record also shows that Burke's own shortcomings as a parent contributed to OCS's decision to remove the children from Burke's and Sondra's home. Burke was either unwilling or unable to realize that his behavior adversely impacted his children: Dr. LaGrande concluded that Burke "does not take responsibility regarding how his actions have negatively impacted his children." There is evidence that Burke had other parenting problems as well. Brenteson testified that "it cannot be perceived that [Burke] is providing support—emotional support, either to [Sondra] or to the boys...." Brenteson observed that throughout visitation Burke "did very little interacting" with his children and she heard Billy tell Burke that he didn't want to talk to him because Burke didn't listen to what he had to say. Billy also told a social worker that Burke chose to play cards with his friends instead of playing with him. As the superior court found, Burke "has never exhibited the experience, ability or inclination to be the primary caretaker for the boys." In sum, both Sondra's and Burke's parenting problems contributed to OCS's decision to remove the children from their home.

Having identified the problems that Burke needed to remedy, we must next consider whether OCS's efforts were reasonable. We conclude that they were, but only marginally so.

Over the four-plus years that OCS was involved with Burke and his children, it provided him with several referrals to counseling programs that were designed to help him become more involved with his family. During the CINA case that involved Burke's three older children, OCS referred Burke to couples counseling, individual counseling, and parenting classes. These programs were designed to help Burke become more involved in parenting his children and in assisting his partner, but Burke declined to participate meaningfully in couples counseling and there is no evidence he enrolled in individual counseling. Dr. LaGrande explained that Burke's disinclination to participate owed to the fact that he "places responsibility for the prob-

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions that are taken under (1) and (2) of this subsection.

22. *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 720 (Alaska 2003).

23. *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 66 P.3d 1, 7 (Alaska 2003).

24. *See Jeff A.C., Jr. v. State,* 117 P.3d 697, 707 (Alaska 2005).

lems in the family on Sondra, [and therefore] takes the position that he is blameless, and does not take responsibility regarding how his actions have negatively impacted his children." Despite the referrals he received, Burke's belief that he was not to blame for his family's problems does not appear to have changed during the pendency of the CINA cases.

Burke argues that OCS's failure to refer him to service providers in his 2005 case plan rendered OCS's efforts unreasonable. Although a case plan normally should refer parents to appropriate service providers,[25] in the specific context of this case OCS's failure to make referrals was reasonable. In addition to the fact that OCS referred Burke to service providers during the three-year duration of the previous CINA case, two other factors mitigate OCS's failure to include referrals in Burke's 2005 case plan. First, OCS was entitled to take into account the fact that Burke had completed only one of three previous referrals.[26] Thus, the fact that Burke previously failed to complete couple's counseling and appears not to have enrolled in individual counseling weigh in favor of concluding that OCS's efforts were reasonable.[27] Second, and more importantly, at the time of the December 2004 removal remedial services in Kodiak appear to have been exhausted. The parties turned to Dr. LaGrande for recommendations about further services only *after* they were unable to determine what other services could be offered in Kodiak to promote reunification. As the children's guardian *ad litem* explained, "Because of the services that had been made available in the past, I didn't know what else could be done at this point in time to provide services to this family...." In sum, Burke's previous lack of cooperation and the exhaustion of resources mitigate OCS's failure to refer Burke to service providers in the 2005 case plan.

Burke argues that OCS failed to explain to him what he needed to do in order to be reunited with Jesse. We disagree. After December 2004, but sometime before the case plan was finalized, Brenteson met with Burke to discuss what types of support services were needed "to provide a stable home setting." Although the case plan could have been written in more simple language, it sufficiently apprised Burke of the improvements that he needed to make in order to be reunited with Jesse. The case plan explained that Burke needed to develop the "skills necessary to positively interact with his children or find[ ] ways to spend quality time with them." Burke's progress was to be measured "through talking about the activities that he does with the children during visitation." The second problem area identified in Burke's case plan was that Burke "does not demonstrate the ability to interact with his family on a positive basis."[28] Burke was asked to develop family-based activities during visitation. Social worker Brenteson also testified that on occasion she would explain what was happening in the case and had "simple conversations about what's next." In light of the facts that OCS had identified the same problems, created similar goals, and referred Burke to services de-

---

**25.** *See Frank E.*, 77 P.3d at 720 ("[T]he requirement that the state offer reunification services is fulfilled by setting out the types of services that a parent should avail himself or herself of in a manner that allows the parent to utilize the services.").

**26.** *See K.N. v. State*, 856 P.2d 468, 477 (Alaska 1993) ("Although ... [OCS] might have done more, it is unlikely that further efforts by [OCS] would have been effective in light of [the parent's] attitude.").

**27.** However, we give Burke's lack of cooperation only limited weight because his lack of cooperation was not pronounced. *Cf. E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 990 (Alaska 2002) (holding that seven-month long

failure to provide active reunification services did not render overall efforts unreasonable where parent had long history of "either refusing services altogether or abandoning treatment plans prior to completion").

**28.** The dissent credits Burke's testimony that he did not know what to do in order to increase visitation and regain custody. (Dissent note 4) But the case plan specifically called upon him to "develop the skills to identify appropriate activities and entertainment in order to spend more time with his children," and to "demonstrate an active participation in the family and meet the support needs of his family." Moreover, Brenteson testified that visitation was not increased over time primarily because of the children's objections.

signed to help him reach those goals during the previous CINA case, we believe that what Burke needed to do under the 2005 case plan was reasonably clear.[29]

Burke also challenges the timeliness of the 2005 case plan. Even though it took OCS a total of six months to finalize the case plan, after the case plan was finalized OCS provided Burke with a reasonable opportunity to show improvement. Supervised visitation was scheduled once each week and it was Burke's children who requested that the frequency of the visits not be increased and home visits not be allowed. During the supervised visits, Burke failed to demonstrate any greater level of involvement with his children than before. Social worker Brenteson testified that "Burke interacted very little with the children" throughout the supervised visitation that OCS arranged. On at least one occasion, instead of interacting with his family, Burke left visitation twenty minutes early and waited in the car for the visit to end. During another visit, Burke became upset with one of his sons for not eating food that Burke had brought to the visit. His son responded that he did not want to talk to Burke, stating "you don't listen to me anyway." Although visitation provided Burke with a reasonable opportunity to show that

he could be more involved as a parent, he failed to do so.

In sum, OCS was involved with Burke's family for over four years and during that time attempted to remedy the same problem: Burke's lack of involvement as a parent. Because OCS referred Burke to classes designed to address this problem and because Burke ultimately did not become more involved despite numerous opportunities to prove to the contrary, we conclude that OCS's efforts were reasonable. We acknowledge that OCS's reunification efforts in this case were far from perfect.[30] In the specific context of this case, however, we conclude that despite OCS's deficiencies its efforts at reunification were reasonable.

## C. The Superior Court Did Not Err in Declining to Order Post–Termination Visitation.

Burke argues that the superior court erred as a matter of law when it concluded that "[t]here is probably no authority for the court to require post termination-visitation." [31] While recognizing that there is no CINA statute that expressly grants the superior court the authority to order post-termination visitation, Burke argues that such visitation should be allowed where it is in the children's best interests. The state and

---

**29.** The dissent concludes that OCS's efforts were insufficient because OCS did not advise Burke to separate from Sondra.

We note first, in response to this argument, that nowhere on appeal has Burke suggested that OCS should have advised him to separate from Sondra. Nor is there any evidence that he would have been willing to separate from her. Second, and assuming that the couple's separation was a course that Burke might have accepted, the cases that the dissent relies on are inapposite: Because of the deficiencies in Burke's own parenting skills, this was not a case in which the only serious obstacle to reunification was Burke's continued relationship with Sondra. Cf. *Ruby A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1152, 2003 WL 23018276 (Alaska, December 29, 2003) (where only obstacle preventing reunification was parent's continued relationship with sexually abusive partner and OCS warned parent of need to end relationship with that partner in order for reunification to occur, OCS's reunification efforts were reasonable); *V.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No.

1124, 2003 WL 393768, *2 (Alaska, February 19, 2003) ("[T]he only serious obstacle to reuniting Victor with Ruth appeared to be Victor's inability or unwillingness to end his relationship with Lisa.").

The dissent also suggests that "Burke for the sake of his children may have chosen to do the very thing that caused him to lose them." This possibility was based on the testimony of social worker Jaquelyn Rush that Burke had told her that he was *not* going to marry Sondra but would stay with her to help her with the kids. But Rush also testified that Sondra had told her that she felt Burke "only wanted her for her money and always was asking her for her Social Security money." Rush also testified that Burke asked for the boys' PFD checks for the purpose of going back to Laos to visit. The superior court made no findings either way in this regard.

**30.** OCS could have finalized Burke's case plan more quickly and reiterated in the 2005 case plan the types of services that Burke should have availed himself of.

**31.** Unlike Burke's previous arguments, this argument involves *all three* of his biological children.

guardian *ad litem* respond that public policy considerations weigh strongly against recognizing any authority in the superior court to order post-termination visitation in cases involving involuntary termination of parental rights.

We addressed the issue of post-termination visitation in *C.W. v. State.*[32] We noted that when adequate grounds for termination exist, there is no presumption that the parent should have visitation rights.[33] This was so because where parental rights are terminated the biological parent does not retain any residual rights relating to his or her child.[34] We did not, however, foreclose the possibility that the superior court could authorize post-termination visitation in extraordinary circumstances. We noted that in such circumstances post-termination visitation would only be permitted "to the extent that the authorized visitation is in the best interest of the child."[35]

The superior court did not find extraordinary circumstances to support post-termination visitation, and we conclude that it was not error for the superior court to decline to make such a finding. The children's guardian *ad litem* testified that the children needed permanency in their lives after having been moved in and out of OCS custody multiple times in a five- to six-year period. In an effort to secure permanency for the children, the state had placed them with foster families that expected to adopt them. Because visits with Burke, who was in an adversarial relationship with the prospective adoptive families, could clearly interrupt the children's sense of permanency with these families, it is unlikely that such visitation would have been in the children's best interests.[36] According-

ly, the superior court did not err when it declined to order post-termination visitation.

## V. CONCLUSION

Because the record supports the superior court's conclusions that Jesse was a child in need of aid, that OCS's reunification efforts were reasonable, and that the court lacked authority to order post-termination visitation, we AFFIRM its decision in its entirety.

MATTHEWS, Justice, with whom BRYNER, Justice, joins, dissenting.

MATTHEWS, Justice, with whom BRYNER, Justice, joins, dissenting.

I believe that the state failed in its obligation to make reasonable efforts to reunite Jesse with Burke.

Jesse was removed from the custody of Burke and Sondra for the first and final time in December of 2004 because of reports that Sondra had physically abused their children. The specific allegations of physical abuse involving Jesse seem relatively minor. But there was no question that in light of Sondra's mental illness and history of physically abusing the other children Jesse was at risk of physical injury so long as he was cared for by Sondra. This meant that Jesse was a child in need of aid and justified at least the temporary exercise of state custody over him.

Child-in-need-of-aid status is step one in a three-step process that can result in the termination of parental rights. The third and final step is a parent's failure to remedy within a reasonable time the condition that made the child in need of aid. The second

---

32. 23 P.3d 52 (Alaska 2001).

33. *Id.* at 57.

34. *Id.*

35. *Id.* at 58.

36. Burke characterizes this case as "one where it is undisputed that post-termination visits are in the best interests of the children," but that characterization is not accurate. It is true that the superior court did amend its findings at Burke's behest to include the following: "Dr.

Susan LaGrande, the state's expert psychologist, testified that it would be in the best interests of the ... children to have contact with their father in the future." But Dr. LaGrande's report was highly conditional. Referring to post-termination visitation as an "ideal scenario," Dr. La-Grande noted that "[t]o meet this ideal scenario [the parents] each must establish an[ ] improved relationship with the children. [Burke] will need to learn how to be interactive and support the individuality of each child." Later Dr. La-Grande noted that Burke had made no progress in this regard. She also noted that "at this time [Burke] has not demonstrated respectful engagement with support services."

step is that the state must make reasonable efforts to enable the safe return of the in-need-of-aid child to one or both parents. These reasonable efforts should be aimed at helping a parent remedy the condition that caused the in-need-of-aid status. If the efforts succeed, the condition will be remedied, the final step will not be reached, and the parent's rights will not be terminated.

As noted above, the condition that caused Jesse to be a child in need of aid was that he was at risk of physical injury from Sondra. This condition could have been remedied by Burke if he had separated from Sondra and made arrangements to care for Jesse in a way that protected Jesse from risk of injury by Sondra. Our case law contains examples where state social workers have advised a parent to separate from a live-in partner where the continued presence of the partner could result in the termination of the parent's rights.[1] But no such advice was given to Burke.[2]

In many cases efforts at reuniting parent and child are likely to fail because of the nature of the parent's problems. In such cases, the reasonable efforts requirement can be satisfied by making efforts that are relevant to the problem that has caused child-in-need-of-aid status even though there is not much hope that the efforts can succeed.[3]

1. *See Ruby A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1152, 2003 WL 23018276, at *1 (Alaska, December 29, 2003) (noting that the parent's OCS social worker told her that unless she evicted her boyfriend, who had sexually molested one of her children in the past, she would lose immediate custody of her children); *V.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, Mem. Op. & J. No. 1124, 2003 WL 393768, at *1 (Alaska, February 19, 2003) (finding that the father "has been repeatedly and explicitly warned by … the social worker, and the court that if [the substance-abusing mother] remained in his home, his parental rights would likely be terminated").

2. Ironically, there is evidence suggesting that Burke stayed in his unhappy relationship with Sondra for the sake of the children. Case worker Rush described their relationship as follows:

> And [Burke] made it very clear that they were not going to get married and at the time that he was going to stay there with [Sondra], help her with the kids, and they would work on their relationship as time goes on, but I think they have decided that their best interest is the children, and they could remain just friends, and take care of their kids, and that they would not [sic] have a platonic relationship, and that they were not going to get married. ("sic" in original.)

Thus, it seems that Burke for the sake of his children may have chosen to do the very thing that caused him to lose them. This underscores the fact that he needed sound advice from OCS.

Today's opinion seeks to cast doubt on this conclusion by noting that Sondra at one point told Rush that Burke only wanted her for her money. Op. at 1247 n. 29. The court seems to be suggesting that instead of staying with Sondra for the sake of the children Burke was staying with Sondra for personal enrichment. No witness, not even Sondra (who testified that she spent the boys' PFD money on clothes, shoes, a computer, and back rent), testified that this was so, and Rush's account of what Sondra told her does not support any such inference. According to Rush, Sondra did not make these statements at the time that Burke told Rush that the couple had decided to stay together because of the children, but at another time when Sondra was dissatisfied with their relationship and was considering leaving Burke. The Q & A between counsel for the guardian at litem and Rush on this point was as follows:

> Q And did she, at times, tell you that she felt like she only wanted her for her money and always was asking her for her Social Security money?
>
> A To pay—to pay rent, to help him pay rent and stuff like that, correct.
>
> Q Did she also tell you that he asked her for the boys PFD checks?
>
> A Yes, he did.
>
> Q And what was he intending to do with them, according to her?
>
> A She felt like he was going to take off and go back to Laos to visit. He wanted to do a burial celebration for his grandparents or father. I can't remember which one it was.

Later in the same examination Rush confirmed that as of the time of trial in May 2006 Burke and Sondra were making sincere efforts to stay together in the hope that the children would be returned: "[T]hey appear to be really working on their relationship and the communication to maintain that, and to continue to work on that so that if the kids come back in the home, they will do better."

3. I am less convinced than the court that Burke was unreceptive to the remedial suggestions of OCS. Burke completed the parenting class and participated in the couples counseling until it was discontinued because he tended to dominate sessions and had attendance problems. The court twice suggests that Burke did not enroll in individual counseling after it was suggested by OCS. Op. at 1245, 1246. But the record is unclear on this point. When asked about the matter, Brenteson testified "I can't honestly re-

But this is not a typical case. Burke has no obvious problems that make him an unfit parent. He is a man who, as the superior court found, works "long hours in the fish processing facilities in Kodiak." He is not addicted to drugs or alcohol and is not sexually or physically abusive. And while Burke was not an ideal parent, there is considerable evidence of his parental involvement. The superior court noted Burke's contributions at the April 2005 adjudication hearing: "[Burke], the children's father, provides a great deal of support. When he is at home, he shoulders many of the responsibilities for cooking and laundry and for childcare." Case worker Rush, who was in the household quite a bit in 2004, also noted Burke's parental support:

> [Burke] did grocery shopping, he did the laundry, you know, when he got up in the morning, he would get [Billy] up, make sure [Billy] was ready to go, you know, just kind of help [Sondra] make sure all the kids were ready to go when they needed to be ready. Before he walked out in the morning, he just made sure everybody was up. So he got [Sondra] up and made sure all the kids were up before he left in the morning. . . . He works at the cannery, so he worked odd hours, but he tried to make sure he was available, you know, left early morning, and then in the evening,

and then they'd let him off for—for lunch to pick up the kids during summer camp, and sometimes in the evening. I've stopped by there a couple evenings, and he was cooking dinner, or he was getting dinner ready. So he was doing his part of the share of house—house keeping chores and making sure things were going okay.

In the case plan that the state developed for Burke on June 2, 2005, the state identified only two interrelated "concerns" with respect to Burke: (1) he had not demonstrated an ability "to interact with his family on a positive basis" and (2) he had "not developed the skills necessary to positively interact with his children or find ways to spend quality time with them." These are common shortcomings among parents. They are not the reasons why Jesse was a child in need of aid, nor are they reasons that would stand in the way of the safe return of Jesse to Burke.

The overriding concern that resulted in Jesse's in-need-of-aid status was that Sondra could not be trusted to be left alone with Jesse. So long as Burke and Sondra remained a couple, Jesse could not be returned to Burke. In the face of this concern, Burke needed the frank advice that unless he separated from Sondra he could not regain custody of Jesse and his parental rights were likely to be terminated.[4] I think that any

---

call if [Burke] actually did any individual counseling." Thus, we know that he successfully completed one of OCS's suggested programs, attended another with less successful results, and compliance with the third—whatever it might have consisted of—is simply unclear.

4. Burke testified that the social worker assigned to his case, Jan Brenteson, never told him what he needed to do in order to regain custody. He testified that Brenteson

> never have no conversation with me, you know. She never tell me what I should do to get my kid—what I do—what I do wrong or what. You know, no communication, you know.
>
> Q So, since December of 2004, have you known what you're supposed to do to get your children back?
>
> A No, I don't know. I don't know nothing.

When Brenteson was in the process of taking the children from the home Burke asked her to leave the children with him. He testified that he received no response and felt powerless to act in the face of authority:

> [S]omehow Jan [Brentenson] come into my house—I going take your kid away from you, I say why, what I do wrong to my kid. Then I asked her, Jan, if you think there some—if you know if—can you leave my kid here at home with me and can you take [Sondra] somewhere else and just emergency for her if she get well, and she come back, you know, with my kids and she don't talk to me. She just took my kid away from me. And I don't know until I have to go to court next day then I know what's going on and well, what can I do. I don't know nothing. I just do what they want me to—I mean do what they want to do because I have no right to say nothing to her especially when the police go over there, so I don't. They got power; I don't have power.

Burke further testified that his requests for additional visitation were also denied and that again he felt that there was nothing he could do:

> Q And have you had any concerns about what the—the way the visits have happened?
>
> A I been thinking a lot and how do I going to open—how got I have—some kind of key to talk to Jan that I can see more my kid in the kind of—see more my kid when I like to

reasonable effort at reuniting Jesse with Burke necessarily would have included this advice. Since it was not given, I would hold that the reasonable efforts requirement was not satisfied and reverse the order of the superior court.

visitation more, but I just don't—because Jackie [Rush], you know, I just don't want to—I always like talk to Jackie. Jackie, can you find some kind of door or window to get to Jan's office. Let's see if I can visit my kid more, you know. And I just—I don't know. I don't have no answer from anybody. It just—I just—what I do is tell [Sondra], [Sondra], you do what you like at home, okay, just try to make yourself comfortable, and I going go work—fight for my bill now, you know, and just do what they want us to do. One time—one hours a day—a week—it's okay, you know. That's all we can do.