NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WILLIAM S., ) | |
| ) | Supreme Court Nos. S-15136/15142 |
| Appellant, ) | (Consolidated) |
| ) | |
| v. ) | Superior Court Nos. 4FA-09-00116 CN |
| ) | and 4FA-09-00117 CN |
| ) | |
| STATE OF ALASKA, ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | No. 1503 - June 18, 2014 |
| ) | |
| Appellee. ) | |
| ) | |
| ANDY S., ) | |
| ) | |
| Appellant, ) | |
| ) | |
| v. ) | |
| ) | |
| STATE OF ALASKA, ) | |
| DEPARTMENT OF HEALTH & ) | |
| SOCIAL SERVICES, OFFICE OF ) | |
| CHILDREN'S SERVICES, ) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael A. MacDonald, Judge.

---

\*    Entered under Appellate Rule 214.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant William S. Rachel Cella, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Andy S. David T. Jones, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.    INTRODUCTION

After the superior court terminated William S.'s and Martha S.'s parental rights in their two youngest children, Andy and Allie, William requested a stay of the termination order while appeal was pending and post-termination visitation with his children.[1] Martha also asked for post-termination visitation. Andy, a teenager who has his own attorney, independently moved for post-termination visitation with his parents. The superior court denied both visitation and a stay pending appeal. We affirmed the termination of parental rights. William separately appeals the denial of his motions for visitation and a stay; Andy appeals the denial of his request for post-termination visitation. Martha did not appeal but has joined in William's and Andy's briefs. Because the superior court reasonably concluded that post-termination contact was not in the children's best interests and because its denial of a stay is moot, we affirm the superior court's decisions.[2]

---

[1]    We use pseudonyms to protect the privacy of the parties.

[2]    We have been notified by William's counsel that William recently died. William's and Andy's arguments on appeal are closely interrelated, and we therefore do not treat any issues as having been mooted by William's death.

## II. FACTS AND PROCEEDINGS

This is the third appeal in the child in need of aid proceedings involving Andy and Allie S. In *Martha S. v. State, Department of Health & Social Services, Office of Children's Services*, we affirmed the superior court's decision adjudicating Andy and Allie as children in need of aid.[3] We later affirmed the order terminating Martha's and William's parental rights.[4]

At the time of the termination trial, Allie was in stable foster care, which was her preadoptive placement.[5] Andy had been in residential treatment the entire time he was in the custody of the Office of Children's Services (OCS), with periodic hospitalizations at North Star in Anchorage.[6] In the year before the termination trial, Andy was placed at Colorado Boys Ranch, where he showed considerable improvement.[7] While there Andy was introduced via Skype to Phil, a potential therapeutic foster care provider in Fairbanks, with whom OCS hoped to place Andy after his return to Alaska.[8]

Andy was not able to stay in Colorado after the termination trial because the Boys Ranch was closing its level five facility — a highly secure level of care — and he was returned to Alaska. Phil had not yet completed the training necessary to qualify his home for therapeutic foster care; OCS wanted Andy to transition through a "step-down" facility before such a placement; and OCS had some concerns that Andy would

---

[3]    268 P.3d 1066, 1081-82 (Alaska 2012).

[4]    *William S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1474, 2014 WL 199882, at *13 (Alaska, Jan. 15, 2014).

[5]    *Id.* at *2.

[6]    *Id.*

[7]    *Id.*

[8]    *Id.*

try to run away if he were placed in Fairbanks. For these reasons OCS placed him instead at the McCann Treatment Center, a residential treatment center in Bethel.

At the termination trial Andy testified that he missed his family and wanted to return to his parents' custody.[9] His trial expert recommended against terminating William's and Martha's parental rights because they and Andy still wanted to be reunited.[10] The superior court nonetheless decided that termination of parental rights was in Andy's best interests, a decision we affirmed.[11]

Andy stayed at McCann for several months, both before and after the termination trial. His parents participated by telephone in eight family therapy sessions at McCann for a total of four hours. Patricia Jollotta, Andy's counselor there, testified that she twice asked William "to not be negative" in those sessions — referring to remarks he made about his frustrations with OCS — and that he stopped as soon as she asked him. Jollotta testified that Andy looked forward to contact with his parents; she did not think William acted improperly in the sessions, but she qualified this by saying that her contacts with him were limited.

About a month after the court terminated parental rights in September 2012, Andy asked the court to permit him to have post-termination contact with his parents. Martha and William both moved for permission to have ongoing visitation with both Andy and Allie. William also requested a stay of the termination order while the appeal was pending. OCS and the guardian ad litem (GAL) opposed the motions.

In mid-January 2013 Andy began to have serious problems controlling his behavior at McCann, and on February 27 he was again placed at North Star. Kathryn

---

[9] *Id.* at *6.

[10] *Id.* at *5.

[11] *Id.* at *6.

Johnson, the OCS social worker then assigned to the case, testified that it was not clear why Andy's behavior deteriorated. She thought it might be "discharge anxiety" because OCS had initially scheduled a visit between Andy and Phil in Fairbanks to take place in mid-January. She testified that OCS rescheduled the Fairbanks visit to mid-February, but Andy did not get back on track behaviorally and was sent to North Star instead.

The superior court held a hearing on the post-termination visitation motions in March 2013. Andy testified briefly, telling the court that he wanted to have contact with his parents because it reduced his stress level. Andy's counselor at North Star, Caterina Giammona, testified at the hearing, as did Jollotta and Johnson. Giammona testified about Andy's treatment and discharge plan, which was a recommendation for another residential treatment program. The rationale was that Andy needed to learn to behave better at a facility with a lower level of care than an acute care facility before he could go to an even less-restricted facility like a group home or a therapeutic foster home. Giammona testified that weekly contact with OCS fulfilled North Star's requirement for family contact, though she did not think the OCS contact was enough to meet Andy's need for social support. She did not have an opinion about whether he should have contact with his parents, because she had never met or interacted with them and had known Andy for only a short time.

Jollotta, who was qualified as an expert in counseling, testified about Andy's treatment at McCann. She testified that he had regular phone contact with Phil during that time and one in-person visit when Phil came to Bethel. She testified that family-type contact is important for children because it brings stability and security to their lives and makes them healthier adults. Jollotta differentiated between Andy's contact with his OCS caseworker, which she characterized as a "working relationship," and his contact with Phil. She thought Andy should continue to have contact with Phil because Andy felt connected to him and they were working toward building a family

relationship. Jollotta testified that Andy would benefit from contact with his parents if (1) they "were appropriate and supportive" and (2) they could be "redirected" or the contact could be terminated if they acted inappropriately.

Jollotta also testified about Andy's behavioral problems at McCann: he had some problems throughout his stay but in mid-January threatened to "do something" if he was not allowed to leave. An OCS psychiatric nurse persuaded him it would be best if he stayed. But Andy's behavior did not improve, and after he had some conflict with other residents, the McCann staff decided he should go to North Star.

Johnson, the OCS social worker, testified at the visitation hearing that OCS was still weighing its options for Andy once he was discharged from North Star. She testified that Phil was still considered a placement option despite the recognized risk that Andy would run away from his care; she testified that Andy himself worried he would be tempted to run home. (He had told Jollatta the same thing.) Johnson could not say whether placement with Phil would be in Andy's best interests because no one knew why Andy had "spiraled" out of control at McCann. She considered it possible that his behaviors would preclude any family placement. She acknowledged that Andy wanted to resume contact with his parents and also with his sister Allie (though she also testified that Allie's therapist did not believe such contact would be in Allie's best interests). Johnson contrasted Andy with Allie, who had "already removed herself from the situation and is forming a life in her foster home." She said it was important for Andy to be able to do the same.

Both parents testified. Martha testified she wanted to have continuing contact with Andy and she would encourage him to remain wherever OCS placed him. She said she would follow any restrictions the court set on contact, including not involving William in the visits.

William testified that if Andy ran away from a placement in Fairbanks, he and Martha would take him back to the placement. William said he always told Andy to follow the rules so he could come home. But as he had at the termination trial, William continued to act inappropriately in the courtroom, interrupting proceedings and insulting his attorney.

At the conclusion of the hearing the court denied the motions for post-termination contact and a stay. The court said that "no new evidence [had been] presented at [the] hearing . . . to support the conclusion that visitation is in the child's best interest." The court stated that "the only evidence on the subject is that [Andy] wants to have continued contact with his parents and that is not new evidence." The court acknowledged that Andy is attached to his parents and also recognized "generalized notions that institutionalization of a child is disfavored, that a child needs family support." The court stressed, however, that Andy had "no healthy family support system" and found that "continued contact with the parents and with the family [remained] contrary to [Andy]'s best interest." The court continued: "The hostility, the adversarial, disruptive, chaotic nature of the family's relations, and . . . the continued conflict that has persisted in this case from its beginning continues even post-termination. It needs to stop." The court described Allie's contrasting progress as "most likely the result of the peace that she's getting from the permanency she's experiencing." The court faulted William for "encouraging [Andy] to get home as soon as possible" and said it was "very disruptive and contrary to his progress." The court reiterated that Martha was "so aligned" with William that "it's not possible to continue contact with one without resulting in the same trigger that is sought to be avoided." The court observed that "something new should be tried that's different[;] . . . trying to heal [Andy] in a more peaceful, less chaotic, disruptive, adversarial setting is something new that should be tried."

Both Andy and William appeal the denial of post-termination visitation or contact. William also appeals the denial of his requests for a stay and for visitation with Allie.[12]

## III. STANDARDS OF REVIEW

We review the superior court's factual findings in a child in need of aid case for clear error.[13] A finding is clearly erroneous if we are "left with a definite and firm conviction that a mistake has been made after a review of the entire record in the light most favorable to the party prevailing below."[14] We review questions of law in child in need of aid cases de novo.[15]

## IV. DISCUSSION

**The Superior Court Did Not Clearly Err In Deciding That Court-Ordered Post-Termination Visitation Was Not In Andy's Best Interests.**

Both William and Andy appeal the superior court's decision to deny court-ordered post-termination visitation as contrary to Andy's best interests. Andy contends that several of the superior court's foundational factual findings are erroneous. Andy also asks that we enumerate factors for superior courts to consider in future post-termination visitation cases. William's arguments raise similar points; he emphasizes his

---

[12]     Because we have already affirmed the superior court's decision terminating William's parental rights, the stay issue is moot: William would not be entitled to any relief even if he prevailed. *In re Tracy C.*, 249 P.3d 1085, 1090 (Alaska 2011). We do not consider this issue.

[13]     *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010).

[14]     *Id.* (citations and internal quotation marks omitted).

[15]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citation omitted).

bond with Andy and the perceived benefits to Andy from continued contact with him and Martha.

OCS responds that the superior court's findings are supported by the extensive record in this case and that the superior court appropriately weighed the evidence in deciding that court-ordered post-termination contact was not in Andy's best interests. OCS contends that "an exhaustive list" of factors for a superior court to consider is unnecessary, just as there is no exhaustive list for superior courts to use in deciding whether termination of parental rights is in a child's best interests.

As the parties all acknowledge, we have left open the possibility that a superior court could in extraordinary circumstances order post-termination contact between a biological parent and a child after parental rights have been involuntarily terminated.[16] We agree with OCS that we need not set out a specific list of factors for a court to consider in such circumstances; many factors may be relevant to any determination of a child's best interests. And our decisions in other cases provide guidance about important factors in this case.

In previous post-termination visitation cases, we have considered the child's need for permanency,[17] the nature or quality of the relationship between the biological parent and the adoptive or preadoptive placement,[18] the parent's attitude

---

[16] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1014 (Alaska 2011) (quoting *Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1248 (Alaska 2007)). AS 47.10.089 permits contact after termination when a parent voluntarily relinquishes parental rights.

[17] *Ralph H.*, 255 P.3d at 1014; *Burke P.*, 162 P.3d at 1248.

[18] *Ralph H.*, 255 P.3d at 1014-15; *Burke P.*, 162 P.3d at 1248 n.36.

toward OCS,[19] and evidence of how visitation affects the child.[20] Expert testimony on these issues may be helpful.[21]

Considering the evidence here in the light most favorable to OCS, as the prevailing party below, we conclude that the superior court did not clearly err when it found that visitation was not in Andy's best interests. At the time of the hearing, OCS was still considering placing Andy with Phil; the court could reasonably have concluded that court-ordered post-termination contact might disrupt that placement and its potential for permanency for Andy.[22] The court retained the hope that Andy, like Allie, would be able to form new family bonds and "heal." This prospect was supported by Jollotta's testimony that Andy should continue to have contact with Phil because he and Andy were working toward establishing family ties. We realize that not long afterward OCS informed the court that it was no longer considering Phil as a placement option because of his geographic proximity to Andy's family, and even at the hearing Johnson recognized that Andy might never have a family-type placement. But placement with Phil was still on the table when the court heard the evidence about post-termination

---

[19]    *Ralph H.*, 255 P.3d at 1014-15.

[20]    *Id*.

[21]    *Id*.;  *Burke P.*, 162 P.3d at 1248; *see also C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 58 (Alaska 2001) (noting expert testimony about child's reconnection with absent parent).

[22]    As the New York Court of Appeals has recognized, court-ordered post-termination contact may have a different impact on prospects for permanency than contact voluntarily allowed by the child-welfare agency or a child's preadoptive placement. *In re Hailey ZZ.*, 972 N.E.2d 87, 97 n.9 (N.Y. 2012) (discussing practical problems with court-ordered post-termination visitation, including concern that prospective adoptive parents may be "reluctant or unwilling to entertain the prospect of facilitating contact between a child and a biological parent sufficiently troubled to have lost parental rights").

visitation, and the court properly considered the possibility that the placement would occur.

The testimony from Andy's counselors at the hearing also supported the superior court's decision. Jollotta favored continuing contact with Phil, but not necessarily with Andy's parents. And neither of Andy's counselors could say that post-termination visitation with his parents was in his best interests, even though both counselors recognized that he needed some additional social support beyond what he received from OCS.

The superior court's finding that William disrupted Andy's treatment was also not clearly erroneous. There is much evidence in the record about how Andy's treatment suffered from his father's inappropriate behavior. William contends that the superior court mistakenly interpreted his repeated advice to Andy to "get home when you can" as urging Andy to run away from treatment, but the court's interpretation is not clearly erroneous given the background of the case, particularly the parents' hostility toward OCS and its social workers.[23] We earlier observed that William described himself as having been at war with OCS for years.[24] This attitude continued through the termination trial, where a counselor from Colorado testified that William still blamed OCS for Andy's mental health problems. William's rude and disruptive behavior during the hearing on post-termination visitation confirmed that he remained unwilling or unable to make the behavioral changes necessary to benefit his children. William minimizes this behavior as being limited to his interactions with "other adults," but the

---

[23]     *See Ralph H.*, 255 P.3d at 1014-15 (noting father's animosity toward OCS in affirming superior court's denial of post-termination visitation).

[24]     *Martha S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 268 P.3d 1066, 1068 (Alaska 2012).

behavior could reasonably influence the court's perception of William's ability to interact with those who would be treating and caring for Andy in the future.

William contends that Andy's age should have factored heavily into the decision on post-termination visitation, noting that several Alaska statutes give weight to older children's preferences.[25] But though given weight, a child's opinion is not determinative under any of these statutes. A court must make decisions about a child's best interests: it may overrule a child's opinion about a testamentary guardian, dispense with his written consent to adoption, or decline to award custody in accordance with his preference.[26] Here, Andy was 12 at the time of the termination trial and when he filed his motion for post-termination contact, and he was 13 when the court held the hearing on visitation. The court had heard expert testimony at the termination trial that Andy was not a mature child, and no new evidence of his maturity was introduced at the visitation hearing six months later. The superior court did not clearly err by failing to follow Andy's stated preference.

We have previously suggested that a biological parent does not have a right to post-termination visitation because the CINA statute does not provide for any residual

---

[25]     *See* AS 13.26.040 (permitting minor who is 14 or older to object to appointment of testamentary guardian); AS 25.23.040(a)(5) (requiring consent of child over 10 years of age in adoption); AS 25.24.150(c) (listing older child's preference as factor in child custody dispute between two parents). *See also Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 971-92 (Alaska 2013) (Carpeneti, J., dissenting) (contending that older children's wishes should be considered in termination of parental rights).

[26]     *See* AS 13.26.040 (permitting appointment of testamentary guardian in spite of minor's objection); AS 25.23.040(a)(5) (permitting court to dispense with child's consent); *Jenkins v. Handel*, 10 P.3d 586, 590-91 (Alaska 2000) (affirming superior court's decision not to award custody of teenagers to parent with whom they expressed desire to live).

rights following termination.[27]  But Andy argues that a child retains an independent constitutional right to visitation with his biological parents.  This case does not require us to decide these questions because the superior court reasonably concluded that visitation was not in Andy's best interests.[28]

V.    **CONCLUSION**

The superior court's decision to deny post-termination visitation is AFFIRMED.

---

[27]    *C.W. v. State, Dep't of Health & Soc. Servs.*, 23 P.3d 52, 57-58 (Alaska 2001).

[28]    We also affirm the superior court's denial of William's request for post-termination contact with Allie.  Allie was in a preadoptive placement at the time of termination, and there was little evidence that continuing contact with William would be in her best interests.  The only evidence William cites to support his request for continuing contact with her is testimony from the termination trial to the effect that she might benefit from some contact with her parents "as long as there could be healthy interactions." Given the family's history, as well as Johnson's testimony that Allie had "already removed herself from the situation and is forming a life in her foster home," the superior court's decision about Allie was not clearly erroneous.