RALPH H., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–14012.

Supreme Court of Alaska.

July 22, 2011.

Caitlin Shortell, Shortell Gardner LLC, Anchorage, for Appellant.

Megan R. Webb, Assistant Attorney General, Anchorage, and John J. Burns, Attorney General, Juneau, for Appellee.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Krista Berghoff, Office of Public Advocacy, Palmer, Guardian Ad Litem.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

In March 2007, after receiving 39 protective service reports involving allegations of abuse and neglect over the course of 15 years, the Office of Children's Services (OCS) removed five children from parents Ralph and Nell based on evidence of physical abuse, mental injury, and chronic neglect.[1] OCS put the children in foster care and provided the parents with case plans. In September 2007 Ralph and Nell had a sixth child, Faith. After the superior court terminated parental rights to Faith's older brother, a separate trial was held with respect to Faith. Based on evidence of the parents' unremedied conduct and conditions that made Faith a child in need of aid, the superior court concluded that it was in Faith's best interest to terminate Ralph's and Nell's parental rights to her. The court also denied Ralph's motion

for post-termination visitation privileges. Ralph appeals the termination order and the denial of the motion for continued visitation; Nell does not.

A review of the record reveals that the superior court did not clearly err in finding that Ralph had not timely remedied the conduct and conditions that placed Faith at substantial risk of harm, did not clearly err in finding that terminating Ralph's parental rights was in Faith's best interest, and properly concluded that Ralph failed to show that ordering continued visitation after termination of parental rights was in Faith's best interest. We therefore affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Ralph and Nell are the parents of Ava, Bella, Daria, Emma, Rex, and Faith. The Office of Children's Services first became involved with the family due to reports of chronic neglect and physical abuse starting in 1992. From 1997 to 2006 the family had an open file with the Department of Health and Social Services, Division of Public Health (the Division).[2] Division personnel considered the family "high risk," and OCS participated with the Division to provide services to the family.[3] In March 2007, after receiving 39 protective service reports involving allegations of abuse and neglect over a 15–year period[4] and finding evidence of "physical abuse, mental injury, and chronic neglect,"[5] OCS removed Ava, Bella, Daria, Emma, and Rex from their parents' care and filed an Emergency Petition for Adjudication of Children in Need of Aid and for Temporary Custody.

Upon removing the children from the family home, OCS placed the children in foster homes throughout the state. An OCS social worker created a case plan for the family,

---

1. We use pseudonyms to protect the family's privacy.

2. *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916, 918 (Alaska 2011).

3. *Id.*

4. The protective service reports included allegations of harsh discipline of the children, domestic violence, and pervasive, chronic neglect including unsanitary living conditions, head lice, insufficient food, and excessive alcohol abuse.

5. *Ralph H.*, 246 P.3d at 919.

referred Ralph for drug and alcohol assessment, referred both parents for psychological assessments to determine what other services were necessary, arranged for supervised visits at the OCS office, and referred the children for counseling services.[6]

On September 18, 2007, Ralph and Nell participated in a parenting/psychological evaluation with Dr. Michael Rose. Dr. Rose concluded that Ralph met the diagnostic criteria for Child Abuse/Neglect, Partner Relational Problem, and Cannabis Abuse. Dr. Rose also diagnosed Ralph with a personality disorder with antisocial and passive-aggressive features. Dr. Rose recommended that Ralph participate in individual therapy for his personality disorder, particularly as it related to abusive parenting; abstain from the use of controlled substances and alcohol; comply with all OCS treatment recommendations; participate in marital therapy with Nell; and obtain employment to show that he could support his family. Dr. Rose further recommended that Ralph's visits with his children be supervised until he showed progress in his treatment goals.

On September 20, 2007, Ralph's and Nell's sixth living child,[7] Faith, was born; OCS filed an Emergency Petition for Adjudication of Child in Need of Aid on the day of her birth based on its prior contact with the family.

On September 25 OCS created an updated case plan, which required Ralph to obtain and maintain employment; obtain appropriate housing; successfully complete parenting classes at Alaska Family Services; engage in individual therapy to develop non-abusive parenting skills; refrain from discussing the OCS case with his children; refrain from physical discipline and verbal aggression toward others; and complete an intake assessment and follow treatment recommendations provided by the Family Violence Intervention Program.

OCS also created a safety plan so that Faith could remain with Nell at a domestic violence shelter in Palmer. Nell and Faith entered the Alaska Family Services shelter on September 26, 2007. After Nell failed to pay her rent on time or at all, failed to attend required classes, and repeatedly missed her 5 p.m. curfew, Nell was informed that she needed to leave the shelter by March 27, 2008.

On March 21, 2008, OCS petitioned for Faith's removal from Ralph's and Nell's custody because the parents continued to expose Faith to secondhand smoke after OCS told them repeatedly that they could not smoke around Faith because of her respiratory syncytial virus bronchiolitis (RSV); Nell continually asked OCS to extend her 5 p.m. shelter curfew and then repeatedly missed the curfew; Nell was taking Faith to an unlicensed daycare provider after OCS told her that Faith needed to be in a licensed daycare facility; and Nell had been evicted from the shelter and thus would no longer have the supervised environment she required to be able to care for Faith. The petition for removal stated that to establish that placement or supervision was no longer necessary, Ralph and Nell would have to demonstrate: (1) "a significant period of stability," including stable housing, employment, and the ability to meet their own basic needs for shelter, food, and other daily needs, and the ability to maintain their home and themselves in a "sanitary, hygienic condition" for a sustained period of time; (2) the understanding that they must provide their children with "appropriate parental structure" by showing that they had the ability to respond to their children's needs and behaviors, that Ralph had learned to manage his anger without the use of physical violence, and that Nell understood the impact of physical abuse on her children and could intervene if her children were being exposed to violence; and (3) that they had taken "full responsibility for the neglect to which they [had] subjected their children" and adopted a "sustained commitment to change."

On January 25, 2008, Ralph and Nell entered a stipulation agreeing that Faith was a

---

6. *Id.*

7. Ralph's and Nell's third child, Chloe, died at the age of 4 months in October 1994. OCS records indicated that she may have died of SIDS, and that an autopsy may have been done, but there is no information in the OCS file regarding the autopsy results.

child in need of aid "for adjudication purposes" under AS 47.10.011(9) as a result of Ralph's and Nell's neglect of their other children.[8] On April 4, 2008, the court authorized Faith's placement in foster care.

In March 2008 Faith's foster parents took partial emergency custody of Faith: Faith lived with her foster parents for three or four days each week and with her adult half-sister the remainder of the week. In February 2009 Faith began full-time placement with her foster parents.

### B. Proceedings

On December 18, 2008, OCS filed a Petition for Termination of Parental Rights to Ava, Bella, Daria, Emma, Rex, and Faith, claiming that Ralph and Nell had not timely remedied their behaviors.[9] By the time of trial, alternate permanent arrangements had been made for all of the children except Rex and Faith. The court granted a continuance of the trial with respect to Faith but proceeded with respect to Rex.[10] The superior court terminated parental rights to Rex because it found that Ralph and Nell had failed within a reasonable time to remedy the conduct or conditions that placed Rex at risk of harm; we affirmed.[11]

Trial on the petition to terminate parental rights to Faith took place on April 13, 14, 15, and June 8, 2010. The superior court heard testimony from social worker Anne Holder, psychologist Dr. Alfred Collins, OCS visitation supervisors Cynthia Bergamo and Kiplynn Roundtree, Ava's foster mother, Faith's foster mother, OCS service specialist Raymond Edwards, Alaska Family Services

case manager Heather Miller, clinician Catherine Okeson, and Ralph. The court also incorporated most of the testimony heard during Rex's 2008 termination trial.[12]

On September 8, 2010, the superior court issued its written Findings, Conclusions, and Order Terminating Parental Rights and Responsibilities to Faith, finding by clear and convincing evidence that: (1) Ralph and Nell had failed to timely remedy the conduct or conditions that placed Faith at substantial risk of harm so that returning Faith to them would place Faith at substantial risk of physical or mental injury; and (2) termination of Ralph's parental rights was in Faith's best interest.[13]

Ralph subsequently filed a Motion to Prohibit Cessation of Visitation, asking the court to order post-termination visitation with Faith. Both OCS and Faith's guardian ad litem (GAL) opposed Ralph's motion. After holding a hearing and reviewing the GAL's written response and Ralph's reply, the court denied the motion without prejudice because Ralph had failed to prove that ordering continued visitation was in Faith's best interest.

Ralph appeals the superior court's finding that he failed to timely remedy the conduct or conditions that placed Faith at substantial risk of harm, the court's finding that terminating his parental rights was in Faith's best interest, and the court's denial of his motion for continued visitation. Nell has not appealed.

### III. STANDARD OF REVIEW

 We review a superior court's factual findings regarding termination of parental rights for clear error.[14] The superior court's

8. Although the record indicates that Ralph and Nell did not believe that Faith was a child in need of aid, Ralph concedes this issue in his brief.

9. For a full discussion of the court's findings regarding Ralph's and Nell's failure to timely remedy the behaviors and conditions that made Rex a Child in Need of Aid, see *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 246 P.3d 916 (Alaska 2011).

10. *Id.* at 920.

11. *Id.* at 920, 923.

12. In its order terminating parental rights, the superior court noted that Ralph's and Faith's

counsel objected to "certain pieces of the prior testimony," but the court stated that it would have made the same findings "even if the prior testimony was disregarded."

13. The court also found by clear and convincing evidence that OCS made reasonable efforts as required by AS 47.10.086 to reunify Ralph and Nell with Faith. Ralph does not appeal this finding.

14. *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 717 (Alaska 2003).

finding that a parent has failed to timely remedy the harmful conduct or conditions that place a child at substantial risk of harm,[15] and the court's determination that terminating parental rights is in the child's best interest [16] are factual determinations that we review for clear error. We will only reverse factual findings under the clearly erroneous standard if, after a review of the entire record in the light most favorable to the party prevailing below, we are left with a definite and firm conviction that a mistake has been made.[17]

▮ Whether the superior court's factual findings comport with the requirements of the CINA statutes is a question of law reviewed de novo.[18]

## IV. DISCUSSION

▮ The superior court must make four separate findings before terminating parental rights. The court must find by clear and convincing evidence that: (1) the child is a child in need of aid, as defined in AS 47.10.011; [19] (2) OCS has made "reasonable efforts" to reunify the child with the parent, as defined in AS 47.10.086; [20] and (3) the parent has not remedied or has failed to timely remedy the conduct or conditions that placed the child at substantial risk of harm.[21] The court must find by a preponderance of the evidence that (4) termination of parental rights is in the child's best interest.[22]

On appeal, Ralph contests the superior court's finding that he did not timely remedy the conduct or conditions that placed Faith at substantial risk of harm, and the court's find-

ing that terminating his parental rights was in Faith's best interest. Ralph also argues that the superior court erred in denying his post-trial motion to prohibit cessation of visitation.

### A. The Superior Court Did Not Err In Finding That Ralph Had Not Timely Remedied The Conduct That Made Faith A Child In Need Of Aid.

▮ Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent "has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury." [23] In making this determination, "the court may consider any fact relating to the best interest of the child." [24] Factors the court may consider include but are not limited to: (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort made by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harm will continue; and (5) the history of conduct or conditions created by the parent.[25] The court "need not accord a particular weight to any given factor." [26] "[W]hether the parent has remedied the conduct or conditions . . . that place the child at substantial risk . . . [is a] factual determination best made by a trial court after hearing witnesses and reviewing evi-

**15.** *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

**16.** *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009) (citing *Frank E.*, 77 P.3d at 717).

**17.** *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009) (internal citations omitted).

**18.** *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 6 (Alaska 2003).

**19.** AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

**20.** AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

**21.** AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

**22.** CINA Rule 18(c)(3).

**23.** AS 47.10.088(a)(2)(B).

**24.** AS 47.10.088(b).

**25.** AS 47.10.088(b)(1)-(5).

**26.** *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

dence, not [a] legal determination [ ] to which an appellate court should apply its independent judgment." [27]

The trial court found that Ralph and Nell had made "some positive changes," but that "due to the overwhelmingly lengthy history and patterns of dysfunction, the changes ... [did] not rise to the level of remedying the conduct and conditions within a reasonable time." The court based its conclusion on its findings that Ralph and Nell continued to place their needs ahead of Faith's needs, were "not functioning at a level necessary to parent" Faith, were not able to understand Faith's needs as a "small, needy, active child," were still in denial about the role they played in the harm their children had suffered, and still needed additional services.

▪ Ralph argues that the court erred in its findings regarding all five factors outlined in AS 47.10.088(b)(1)-(5).[28] Although the superior court did not specifically discuss AS 47.10.088(b), a review of the court's findings in light of the five factors listed in AS 47.10.088(b) reveals that the court's ultimate determination that Ralph had not timely remedied the conduct and conditions that placed Faith at substantial risk of harm was not clearly erroneous.

Ralph argues that the trial court erred in finding that Faith had a low likelihood of returning to Ralph and Nell in a reasonable period of time because the trial court acknowledged that Ralph and Nell had made

progress, such as maintaining a cleaner apartment and showing positive changes in Ralph's second psychological evaluation. But the superior court ultimately found that Ralph and Nell "continue to place their own needs ahead of the needs of their child and [were] not functioning at a level necessary to parent [Faith]," and that even if "progress of internalization" continued at an "exponential rate, it would still be a year before reunification could be safely considered." [29] Legislative finding (5) in AS 47.05.065 indicates that children under the age of six must be placed in permanent homes "expeditiously":

> [N]umerous studies establish that[:] children undergo a critical attachment process before the time they reach six years of age; [ ] a child who has not attached with an adult caregiver during this critical stage will suffer significant emotional damage that frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood; and [ ] it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously.

The superior court's substantiated finding that reunification could not be safely considered for at least a year was thus an implicit finding that there was a low likelihood of reunification occurring within a reasonable

27. 234 P.3d at 1253.

28. Ralph also argues that the trial court erred in considering "subjective" evidence, such as his "thinking errors," when making its determination that he had not remedied the conduct and conditions that placed Faith at substantial risk, citing *G.C. v. State, Dep't of Health & Soc. Servs.*, 67 P.3d 648, 651–52 (Alaska 2003), for the proposition that the court may only consider objective evidence of his remedial efforts. The legal standard discussed in *G.C.* applies only to determinations of whether a parent has abandoned a child under AS 47.10.011(1), not the court's "failure to remedy" determination, which, "by its very nature, requires not just an evaluation of objective conduct, but also broader and more subjective considerations and judgments." *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114–15 n. 14 (Alaska 2008).

29. The record contains ample support for the court's finding that reunification could not occur for at least a year. Dr. Collins testified that reunification, if it occurred, "would need to be a very slow process that's monitored constantly to see how successful it'd be," and stated, "At this point, I think [Ralph and Nell] need a great deal of assistance, and I anticipate that they'll continue to need help for [some time], meaning years to come...." He also noted that any progress made needed to be judged taking Ralph's low starting point of "extreme social maladaptation" and history of "execrable" parenting into account. Similarly, OCS visitation supervisor Raymond Edwards testified that "given [Faith's] age, the history [and the] lack of acknowledging and recognizing the conditions of the home that existed prior ... it would be potentially devastating if ... [Faith] was returned home with the idea of reunification and OCS stepping away."

period of time given Faith's young age and need for "expeditious" permanency.

Ralph also argues that the superior court erred by "focusing more on subjective perceptions of [Ralph's] psyche" than on his objective efforts to remedy his conduct or conditions. But the record contains numerous objective indicators that any efforts Ralph made to remedy the conduct and conditions that placed Faith at risk of harm were "too little, too late." Anne Holder testified that Ralph had not reentered the violence intervention program as of September 2009, notwithstanding OCS's request that he do so after displaying violence towards OCS workers: Testimony admitted from Rex's termination trial revealed that after he had completed the first set of violence intervention classes, Ralph threatened to kill social worker Charlene Naulty if Rex wasn't returned to him and was escorted out of the OCS building for yelling at Naulty and calling her names; continued to yell and scream at foster parents; failed to demonstrate im-

pulse control; and raised his voice at the GAL during a home visit with Rex. Both Raymond Edwards and Ralph testified that Ralph had not yet paid the money he owed for his previous violence intervention program as of the time of trial.[30] Ralph's own testimony revealed that he had made minimal efforts to obtain stable employment and to demonstrate that he had the ability to provide financially for his children's needs, place those needs above his own desires, and provide for the needs of his family rather than relying on others.[31] Ralph's testimony also revealed that Ralph had made minimal efforts to remedy the conditions in his home that placed Faith at risk of harm from secondhand smoke.[32] Ralph's failure to comply fully with any of the requirements of his case plan[33] thus supports the superior court's finding that Ralph's efforts were insufficient.

Ralph correctly argues that the trial court found that Faith "really hasn't suffered in a measurable amount like her siblings

---

30. Ralph began cutting lawns as community service to pay the balance he owed for his violence intervention classes just one week before Faith's termination trial, and indicated that he had not done community service work earlier because he had been "under doctor's orders for limited work," stating: "I'm only allowed to sit for four hours or stand for four hours. I can't lift anything over 10 pounds, and I'm not supposed to lift anything above my head." But when the court later asked Ralph about these limitations, Ralph admitted that the doctor's work authorization actually states that he can work eight hours a day.

31. At the time of Faith's termination trial, Ralph was unemployed and had a suspended driver's license. When asked what efforts he had made to find work, Ralph stated that he was going to "job service at least once or twice a month" to "surf the board to see what kind of cooks or cooks' helpers or jobs like that there are," and that he had applications "all over the Valley," including two specific prospects he hoped would work: one on a houseboat in Ahtna, and one based out of Cordova and Valdez. When asked how he would manage Faith's care if he was hired for a job out of town, he asserted that he and Nell "would have to get daycare ... [t]here's no doubt about it."

32. Cynthia Bergamo, the OCS visitation supervisor, testified that visitation was moved to McDonalds because Ralph's and Nell's apartment "was very stuffy and smoky," which caused Faith's eyes to turn red and was especially pro-

blematic because of Faith's RSV. When asked if he had remedied the smoke smell in his apartment, Ralph stated that he "went and bought an air purifier" and that he keeps the windows open and has fans "blowing fresh air in almost constantly." Ralph also testified that both Ralph and Nell smoke in their car, but that "if Faith were to come home, that would stop immediately and [they] would clean it out top and bottom."

33. After Ralph's parental rights to Rex were terminated, OCS created an updated case plan for Ralph that required Ralph to: (1) engage in couples therapy with Nell and individual therapy aimed at developing non-abusive parenting skills, problem solving skills, and coping without violence skills; (2) demonstrate the ability to refrain from using aggressive behavior and all forms of physical discipline and verbal aggression towards all people when in conflict or when facing stress and frustration; (3) complete another intake with the Family Violence Intervention Program, follow treatment recommendations, and pay the balance he owed for his previous participation in the program; (4) maintain stable employment, and demonstrate that he has the ability to provide for his children's needs and place those needs above his own desires by honoring his financial obligations and providing for his family's needs rather than relying on government or private organizations or individuals; and (5) pass random urinalysis tests. Testimony at Faith's termination trial revealed that Ralph had not fully complied with any of these requirements.

have...." Social worker Anne Holder noted in her testimony that Faith is Ralph's and Nell's only child who has not yet been exposed to the pattern of harm that caused lifelong reactive attachment disorders in their older children. But Ralph fails to acknowledge that he has not yet had an opportunity to parent Faith because she was removed from his custody immediately upon birth and had been out of Nell's custody for 80% of her life at the time of her termination trial. The superior court's analysis therefore properly focused on Ralph's and Nell's history of abuse and neglect and the likelihood that the pattern of abuse and neglect would continue, rather than harm already suffered.

Alaska Statute 47.10.088(b)(5) specifically authorizes the court to consider "the history of conduct by or conditions created by the parent" when making its determination about whether a parent has remedied his conduct, and we have directed trial courts to consider

the totality of the State's evidence in assessing the risk of future harm to children.[34] Testimony from Faith's termination trial and testimony adopted from Rex's termination trial combined reveal that Ralph and Nell have an extensive history of physical and mental abuse and neglect of their children that dates back to 1992.[35]

In addition, several witnesses testified that Ralph's apparent failure to internalize his treatment and accept responsibility for the harm he caused to his older children made it very likely that Ralph would continue his past pattern of abuse and neglect if Faith was returned to his custody.[36] Although Ralph testified that he had accepted responsibility for the harm he caused his children,[37] both Dr. Collins and Ralph's mental health therapist, Cathy Okeson, testified that Ralph had neither accepted responsibility for the harm nor internalized the treatment he had received.[38]

**34.** *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 79 P.3d 50, 54 (Alaska 2003).

**35.** *See Ralph H. v. State, Dep't of Health & Soc. Servs.,* 246 P.3d 916, 918–20 (Alaska 2011). At Faith's termination trial, Holder also testified that " 'a clear and definite pattern' of behavior" extended back to 1993, in which Ralph and Nell would "rise to the challenge" of parenting while receiving an array of services from OCS, but once the services were no longer in place, Ralph and Nell "were not able to sustain the changes" they made.

**36.** Holder noted that Ralph had yet to complete critical elements of his case plan, stated that she had "no reason to believe that [Ralph had] internalized any of the need for change," and expressed concern that Faith would be exposed to her parents' "significant harmful parenting patterns" if services ended after reunification. Similarly, Dr. Collins stated that Ralph's and Nell's "track record" was "very consistent," "goes on for a very long time," and was supported by Dr. Rose's findings that both Ralph and Nell have personality disorders that cause "long-standing patterns of behavior that are, by their very nature, extremely resistant to change." Dr. Collins concluded that Ralph had still not taken responsibility for the actions that led to his children's removal, and explained why doing so was essential to Ralph's ability to care for Faith: "[I]f [Ralph doesn't] understand why it happened in the first place, [he's] not likely to change the behavior that caused it to happen." When asked what he thought would happen if Faith was released to Ralph and Nell without supervision and oversight by the court, Dr. Collins stated: "I

think it's likely that they would fall into the same pattern of abuse and neglect that they were in before. Perhaps not as bad, though."

**37.** On June 8, 2010, Ralph testified that his five older children were removed by OCS because he "was a lousy parent [who] was neglectful [and] verbally and physically abusive," and that Faith was removed out of fear that he hadn't changed. He stated that he had changed the way he addresses people and how he expresses his feelings after he "went to parenting classes [and] Family Violence Intervention class," which made him "see just how much [he] hurt [his] children," noting that he had completed these classes two years prior to Faith's termination trial. Ralph also testified that he decided to "change" because he knew if he didn't change "there was no possibility for [his] children to ever come home," that he recognized that he "was bitter [and] blamed everybody else for [his] problems except the person who was really to blame, and that was [himself]," and that he had "taken responsibility for [his] actions."

**38.** Dr. Collins concluded after his February 2010 evaluation of Ralph that Ralph seemed unable to take responsibility for the loss of his children, and that he blamed Faith's foster parents and OCS for the loss of Faith. Dr. Collins ultimately concluded that the improvements shown by Ralph and Nell were "significant but not internalized," explaining:

[Ralph and Nell] must still rely on outside sources of support for their developing parenting skills and would be unable to sustain their gains without ongoing therapy and other sup-

Thus, given the extensive testimony offered regarding the low likelihood of reunification occurring within a year, Ralph's minimal efforts to remedy the conduct and conditions that placed his children at risk of harm, Ralph's history of abusing and neglecting his older children, Ralph's inability to accept responsibility for the harm he caused to his older children, and Ralph's failure to internalize the treatment he had received, the superior court's determination that Ralph failed to timely remedy the conduct and conditions that placed Faith at substantial risk of harm was not clearly erroneous.[39]

### B. The Superior Court Did Not Err In Finding That Terminating Ralph's Parental Rights Was In Faith's Best Interest.

Before terminating parental rights, a superior court must find by a preponderance of the evidence that termination is in the child's best interest;[40] the court's determination is reviewed for clear error.[41] Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh the evidence when the record provides clear support for the superior court's ruling.[42]

The superior court found by clear and convincing evidence that terminating Ralph's parental rights was in Faith's best interest. In making its determination, the court balanced both "the harm to Faith in terminating versus not terminating the parental rights," as well as "the harm to Faith in terminating the bond with Ralph and Nell versus terminating the bond with [her foster parents]." The court concluded that "the balance on both accounts" weighed in favor of finding that terminating parental rights to Faith was in Faith's best interest. The court relied specifically upon its findings that: terminating parental rights to Faith would prevent Faith from suffering the harm that had been caused to her siblings; Faith's primary bond was with her foster parents; Faith's foster mother seemed "sincere in her desire to foster any relationships that would be healthy for Faith"; Faith had a "blood sibling" (sister Emma) in her foster home; Faith had been in foster care for more than 80% of her life; and there was no evidence that "further delay of the termination proceedings would result in [Ralph and Nell] following through with the case plan at a level that would result in reunification" such that a delay would be beneficial.

Ralph argues that the superior court erred in finding that the "balance on both accounts" favored terminating parental rights. Specifically, Ralph argues that "it was patently impossible for [Faith's] bond with her biological parents to be stronger than her bond with the foster parents" because of the "early removal" of Faith from Ralph's and

---

port.... The progress is moderate at this point, but falls far short of compelling evidence of capability to parent a two year old child. Similarly, therapist Okeson testified that notes from her sessions with Ralph stated that: in June and July 2009 Ralph was "not taking full responsibility" for what happened with his children and hadn't internalized what he and Okeson were "processing"; in October 2009 Ralph was angry, resentful, "continuing to play the victim," and "didn't understand about his relationship with his daughters"; in November 2009 Ralph wasn't able to understand why two of his children would not want to return to his care, stated that the children would be "dead to him" if they changed their names after being adopted, and was not taking responsibility for his actions; and in January 2010 Ralph was "derogatory and aggressive" towards his eldest daughter but "felt that he dealt with [her] just fine," and continued to "play the victim." Okeson identified Ralph's views about his children as "thinking errors," and stated that she believed Ralph would need to

continue therapy for "a minimum of ... another 6 months to a year."

39. *Cf. Tessa M. v. State, Dep't of Health & Soc. Servs.*, 182 P.3d 1110, 1116 (Alaska 2008) (mother's acknowledgment that her child had been abused until "just before trial," two years after OCS created a case plan, supported the finding that mother had not remedied her conduct and that her child would be at substantial risk of harm if returned to her).

40. *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 850 (Alaska 2009) (citing CINA Rule 18(c)(3); AS 47.10.088(c)).

41. *Id.*

42. *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008).

Nell's home, and that the superior court "gave insufficient weight to the evidence of Ralph's progress and the bond between Ralph and Faith." Ralph also argues that the superior court "misconstrued [Ralph's] mettle in testifying on his own behalf" as "thinking errors," and he asks us to conduct an independent review of the record to determine whether the superior court's findings satisfy the CINA statute and rules.

 Ralph concedes that it is appropriate for a trial court to consider a child's bond with foster parents in making the best interest finding,[43] and that it is in the trial court's discretion as to how to weigh the evidence of the parental bond. Although Dr. Collins noted that there was an attachment between Ralph and Nell and Faith, he ultimately concluded that Faith's primary attachment was with her foster parents. He also testified that taking Faith away from her foster parents "at this point ... could definitely cause problems for her later on since they are her primary attachment figures right now ... [because Faith] has been with [her foster parents] since the age of six months." When asked whether severing the bond with Ralph and Nell or severing the bond with Faith's foster parents would result in more harm, Dr. Collins stated that, though "severing [the bond with] either one of them would be traumatic for [Faith]," "[p]robably severing the relationship with the [foster parents] would be more so."

 The trial court may also consider a child's need for permanency at the time of the termination trial when making its best interest determination.[44] As discussed above,[45] the legislature has recognized that children under six can suffer "significant emotional damage"[46] if they do not have permanency in their lives. Holder emphasized Faith's need for permanency given her young age and the length of time she had been out of her parents' care, noting that Faith had been living with her foster parents for almost two years at the time of trial, had formed a bond with her foster parents, and had learned her foster parents' structure and routines. Holder noted specifically that "the child's best interest, indeed, is to achieve permanency within a relatively short period of time in the life of the case" and concluded that she "would be gravely concerned about changing [Faith's] environment and family home at this point." Similarly, Raymond Edwards testified that "children need permanency, particularly ... small children. It is absolutely critical for their development.... [Faith is] doing well [with her foster parents]. I don't believe [Ralph and Nell] would be able to provide her with a safe environment [that] would meet her needs for the next ... 16, 18, 20 years."

Although Ralph correctly notes that both the amount of time that Faith has been with her foster parents and the bond Faith has formed with her foster parents resulted from OCS's removal of Faith from Ralph's custody shortly after her birth, Ralph fails to acknowledge that the reason for Faith's removal was Ralph's history of abusing and neglecting his older children. Ralph's argument that the trial court failed to consider his "determination and capability to change" is also unpersuasive; the superior court found specifically that "there is no evidence that further delay of the termination proceedings would result in Ralph following through with the case plan at a level that would result in reunification, so that a delay would not be beneficial to the child," and this finding was amply supported by the record.[47]

**43.** *See M.W. v. State, Dep't of Health & Soc. Servs.,* 20 P.3d 1141, 1147 (Alaska 2001).

**44.** *See Dashiell R.,* 222 P.3d at 850–51 (holding that trial court's finding that children were in immediate need of a "permanent, stable relationship" was sufficient to support trial court's finding that termination of parental rights was in children's best interest).

**45.** *See supra* Part IV.A.1.

**46.** AS 47.05.065.

**47.** The extensive evidence offered at trial regarding Ralph's long history of abusing and neglecting his children, OCS's repeated attempts to assist Ralph, and Ralph's only recent, minimal, and insufficient attempts to change the behavior and conditions that rendered all six of his children "in need of aid" supports the superior court's finding that continuing to wait for Ralph to complete his case plan nearly two decades after a case plan was first established for him was not in Faith's best interest. *See supra* Part IV.A.

**1014**

Because the superior court properly considered evidence of the bond Faith had with her foster parents and Faith's need for permanency, and because the record provides ample support for the superior court's findings, the superior court's determination that terminating Ralph's parental rights was in Faith's best interest was not clearly erroneous.

### C. The Superior Court Did Not Err When It Declined To Grant Ralph Post–Termination Visitation Privileges With Faith.

Finally, Ralph appeals the superior court's denial of his post-trial motion to prohibit cessation of visitation, arguing that testimony from Faith's termination trial indicated that continuing visitation would be in Faith's best interest. Specifically, Ralph notes that Heather Miller testified about one visit when Ralph and Nell "handled the situation as best as any parent could" after Faith indicated that she did not want the visit to end, and that Dr. Collins testified that it would be detrimental for Faith's bond with her parents to be severed and in Faith's best interest to continue that relationship.

After holding a hearing on the motion, the superior court denied Ralph's motion *without prejudice,* finding that Ralph had failed to prove that ordering continued visitation after Ralph's parental rights had been terminated was in Faith's best interest. At the hearing, the superior court specifically noted that neither party had presented additional evidence regarding whether ordering continued visitation between Faith and Ralph was in Faith's best interest and concluded that, although it was not finding that it was *not* in Faith's best interest to have continued contact with her parents, Ralph had not met his burden of proving "by a preponderance of the evidence" that it was "more to [Faith's] benefit to ... order [continued contact with Ralph] than not." We agree.

After a trial court terminates parental rights, the parent retains no residual parental rights to the child.[48] Although there is no CINA statute that expressly grants the superior court the authority to order post-termination visitation,[49] we have not foreclosed the possibility that the superior court could authorize post-termination visitation in "extraordinary circumstances."[50] In such circumstances, post-termination visitation will only be permitted "to the extent that the authorized visitation is in the best interest of the child."[51]

In *Burke P.,* we concluded that the trial court did not err when it declined to find extraordinary circumstances supporting post-termination visitation.[52] The trial court in that case based its decision on testimony from the GAL that the children "needed permanency in their lives," evidence that the children had been placed in foster homes that expected to adopt them, and evidence that the father was in an adversarial relationship with the prospective adoptive families, which "could clearly interrupt the children's sense of permanency with [their foster] families."[53] We concluded that it was therefore "unlikely that such visitation would have been in the children's best interest."[54]

Similarly, the record in this case reveals that Faith needs permanency in her life, that Faith has been placed with a foster family that intends to adopt her, and that Ralph has expressed feelings of animosity towards OCS workers and Faith's foster parents. As discussed above, Anne Holder, Raymond Edwards, and Dr. Collins testified to the need for permanency in Faith's life, especially giv-

48. *C.W. v. State, Dep't of Health & Soc. Servs.,* 23 P.3d 52, 57 (Alaska 2001).

49. Ralph argues that "there is a provision allowing post-relinquishment visitation under AS 47.10.089(d)-(j)," but AS 47.10.089 deals with voluntary relinquishment of parental rights, not involuntary termination of parental rights, and thus is not applicable in this case.

50. *Burke P. v. State., Dep't of Health & Soc. Servs., Office of Children's Servs.,* 162 P.3d 1239, 1248 (Alaska 2007).

51. *C.W.,* 23 P.3d at 58.

52. 162 P.3d at 1248.

53. *Id.*

54. *Id.*

en her young age,[55] and Faith had lived for over two years part-time and over one year full-time at the time of trial with a foster family that planned to adopt her. Dr. Collins's testimony at Faith's termination trial also indicated that Ralph blamed Faith's foster parents and OCS for Faith's removal, and testimony adopted from Rex's termination trial revealed that Ralph's relationship with OCS workers and his older children's foster parents had become adversarial and hostile after OCS petitioned for removal of the children, indicating that Ralph's feelings of animosity towards Faith's foster parents could result in a similarly adversarial relationship if the court ordered continued visitation.

In addition, the record contains conflicting testimony regarding the impact that continued visitation with Ralph would have on Faith. As the superior court noted at the motion hearing, Dr. Collins testified that "[i]t would be better not to have either [Faith's foster parents' or Ralph's and Nell's] relationships [with Faith] totally terminated" because "there is definitely a [warm] bond between [Ralph and Nell and Faith] ...," and Heather Miller, the case manager who supervised visitations with Faith, testified that Faith had indicated that she did not want to leave at the end of some visits with Ralph and Nell. But OCS visitation supervisor Cynthia Bergamo and Faith's foster mother both testified that Faith had exhibited signs that visitation sessions with her parents had recently begun to cause her distress: Bergamo described one incident in which "[Faith] was crying [and] saying no, she didn't want to leave the foster parent, she didn't want to get in the vehicle" prior to a visit, and Faith's foster mother testified that Faith had recent-

ly begun to bite herself, pull her hair, rip her clothes off, and make "blood-curdling screams" on parent visitation days. Her foster mother also testified that Faith had begun to throw "20-minute tantrums," have nightmares that were "horrific, to the point of [making Faith] unconsolable" before visitation days, and that Faith would say "they don't like me" when asked why she didn't want to go see Ralph and Nell. Thus, although some evidence presented at trial supported a finding that continuing visitation might be beneficial to Faith, other evidence suggested that continuing visitation with Ralph could actually be harmful to Faith.

Because termination of parental rights results in automatic cessation of visitation and the record before the superior court did not clearly show that continuing visitation would be in Faith's best interest, we conclude that the superior court did not err in determining that Ralph failed to meet his burden of showing that continued visitation was in Faith's best interest.[56]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's findings that Ralph failed to timely remedy the conduct or conditions that placed Faith at serious risk of harm and that termination of parental rights was in Faith's best interest, the superior court's order terminating Ralph's parental rights to Faith, and the superior court's denial of Ralph's motion to prohibit cessation of visitation.

---

55. *See supra* Part IV.B.

56. We also note that Ralph failed to renew his motion for continued visitation after his initial motion was denied without prejudice. As OCS points out, because the motion was denied without prejudice, Ralph could have renewed his motion and presented new evidence in an attempt to establish that continued visitation was in Faith's best interest. Ralph argues that he had "no viable way to present evidence of extraordinary circumstances" because "there was no way for [Ralph] to show that [Faith] missed him if he was no longer provided visits with her, and the witness who would testify to that was the foster parent who wanted to adopt her and

would thus have no motivation to be forthcoming," and that "OCS, not [Ralph], was the only party positioned to offer" new evidence to establish the existence of extraordinary circumstances. But the superior court made clear that Ralph could have offered additional testimony from Dr. Collins, Mr. Edwards, or any trained social worker, psychiatrist, or psychologist regarding the benefits of continued visitation for children after parental rights are terminated, or he could have called Faith's foster mother to testify about Faith's recent behavior. Such evidence was not solely in OCS's possession and Ralph did not need access to Faith in order to present such evidence.