NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JAKE B., | ) | |
| | ) | Supreme Court No. S-14631 |
| Appellant, | ) | |
| | ) | Superior Court No. 3KN-10-00041 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1440 – October 31, 2012 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Kenai, Anna Moran, Judge.

Appearances: Renee McFarland, Assistant Public Defender, Quinlan Steiner, Public Defender, Anchorage, for Appellant. Dario Borghesan, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee. Anita Alves, Assistant Public Advocate, Richard Allen, Public Advocate, Anchorage, Guardian ad Litem.

Before: Fabe, Chief Justice, Carpeneti, and Stowers, Justices. [Winfree, Justice, not participating.]

---

\*      Entered under Appellate Rule 214.

# I. INTRODUCTION

A father appeals the superior court's termination of his parental rights to his son on three grounds. First, the father argues that the superior court erred in finding that he had not remedied his conduct within a reasonable time. Second, the father challenges the superior court's finding that the Office of Children's Services (OCS) made reasonable efforts to provide family support services. And third, the father claims that the superior court erred in finding that termination was in his son's best interests. Because the superior court's factual findings were not clearly erroneous and its legal conclusions were not erroneous, we affirm the superior court's judgment.

# II. FACTS AND PROCEEDINGS

## A. Facts

### 1. Max's birth and OCS custody

Max was born to Jake and Jeannie B.[1] in September 2006. Max is not an Indian child as defined in the Indian Child Welfare Act.[2] Jeannie admitted to using drugs during her pregnancy. After Max tested positive for cocaine and benzodiazepines, OCS took emergency custody of him. Jeannie relinquished her parental rights in October 2011. Jake was incarcerated from July 2006 to February 2007 on a felony drug charge in violation of his probation. Jake had a history of drug use and distribution and was incarcerated for the first five months of Max's life.

---

[1] We use pseudonyms to protect the privacy of the parties.

[2] The initial emergency petition stated Max was "believed to be" an Indian child, and the Kenaitze Indian Tribe and the Nakenu Family Center were involved in the matter. The subsequent petition for termination of parental rights clarified that Max is not an Indian child, and the record does not contain further involvement of the Kenaitze Indian Tribe.

### 2. Jake's release from prison and his case plan

Jake signed an OCS case plan in 2007 that included substance abuse assessment with periodic urinalysis tests (UAs), a psychological evaluation, and parenting classes. Dr. Paul E. Turner, a clinical psychologist, diagnosed Jake with a substance abuse problem and a personality disorder with narcissistic and antisocial features. Dr. Turner also recommended 24 sessions of therapy with a focus on "anger management, consistency, empathy, and impulse control." At the same time, Dr. Turner advised that "it would be helpful if he were to continue treatment beyond the twenty-four recommended sessions." Based on the OCS referral, Jake completed 46 therapy sessions. The required parenting classes were designed to teach Jake how to "show affection" to his son and care for a "neurodevelopmentally disabled child."

In 2007 Jake appeared to make steady progress with his case plan. He followed the OCS referral and attended both his own and Max's therapy sessions. He also received parenting classes at his home and began visitations with Max, though Jake missed his first two overnight visits.

### 3. Jake's relapse and incarceration

In September 2007 Jake was arrested for consuming alcohol in violation of his probation conditions. Jake did not participate in services or visitation with Max until December 2007, due to his incarceration and his third-party custodian's schedule.

OCS sought a termination order in February 2008. In response, Jake requested a permanency hearing, and the superior court found that Jake had made "substantial progress" to remedy the conditions that led Max to be a child in need of aid. The court found that reunification was the proper permanency goal but warned Jake that "[t]he stakes are high," and if he relapsed, termination would be the next step. Jake assured the superior court that "I know myself that it's never going to happen again."

#### 4.      Jake's custody of Max

Jake completed the steps in his case plan, including substance abuse treatment, therapy, and parenting education. He also complied with his conditions of probation. Because Jake was improving, OCS petitioned the court to give Jake custody of Max. The court granted the petition in August 2009, and Jake had full custody over Max by early 2010. That summer, Jake moved to Anchorage with Max and remarried.

#### 5.      Jake's relapse and OCS custody of Max

In September 2010 Jake had a serious automobile accident and went to the hospital. Jake's probation officer learned from Max's caregiver that Jake had been consuming alcohol while at home. The probation officer also learned that Danni, Jake's new wife, had obtained a domestic violence protective order against Jake. Danni explained in the order that she feared physical harm. Danni also stated that Jake had verbally abused her, had thrown a beer bottle at her head, and had been drinking almost every night.

Jake was arrested for violation of his probation on September 22, 2010 and then again on December 12. Jake was incarcerated until March 24, 2011. During his incarceration, Jake placed Max with Max's maternal aunt. The aunt reported to OCS that Max was out of control and that Jake had not provided the paperwork for Max to enter support services. Since the aunt told OCS she could not care for Max, OCS resumed custody.

Although Max was "developmentally and emotionally on track" when Jake took custody in 2009, 18 months later when Max was returned to OCS, he was diagnosed by Dr. Philip Mattheis, a pediatrician who specialized in developmental disabilities, with Complex Emotional Trauma. Dr. Mattheis also observed that Max was "at [a] very high risk of . . . destabilizing beyond the point of return." He explained that Max had

"complex emotional trauma with extended exposure to domestic violence and other erratic, violent, poorly controlled behavior."

Dr. Turner performed an updated psychological evaluation of Max in June 2011. He diagnosed Max with reactive attachment disorder, post-traumatic stress disorder, and neglect. Dr. Turner testified that Max's repeated breaks with important caregivers caused Max's disorder. Max had experienced successive breaks from each of his caregivers, including his first foster family, his stepmother, his father, and his aunt. As a result, Max disassociates and finds it difficult to form attachments.

### 6. Jake's case plan

OCS filed for termination of Jake's parental rights on February 11, 2011, after Jake's incarceration for the probation violation. After filing the petition for termination, OCS continued to work with Jake on another case plan. OCS recommended a variety of support services, including a new substance abuse assessment, parenting education tailored to Max's needs, an updated psychological evaluation, and a batterer's intervention program. Jake complied with the case plan except for the batterer's intervention program, which he claimed he did not need.

In July 2011 Dr. Alfred Collins, a clinical psychologist, evaluated Jake and diagnosed him with a personality disorder with narcissistic and antisocial features. Dr. Collins's conclusion was similar to Dr. Turner's diagnosis from 2007. Both psychologists diagnosed Jake as having a personality disorder with narcissistic and antisocial features and observed that Jake put his own needs before Max's needs.

Dr. Collins recommended six months of intensive Dialectical Behavioral Therapy and two years of additional therapy but noted that Jake's personality disorder is difficult to treat. Dr. Collins acknowledged that Jake "does not exactly fit the Borderline Personality Disorder type that Dialectical Behavioral Therapy was created to

serve, but he is close enough that this form of mindfulness-based treatment would be appropriate for him."

Three months later, OCS added Dialectical Behavioral Therapy to Jake's case plan. Ultimately Dr. Collins thought Jake had less than a 50% chance of success even with treatment. Dr. Turner's prognosis was equally dire and predicted that Jake's inability to parent Max would continue.

## B.    Termination Trial

At the termination trial in October 2011, the superior court considered testimony from a pediatrician, psychologists, community members, and Jake. Jake testified that this time things would be different because he had embraced his religious faith and had regularly attended AA meetings. But even though Jake knew he was being monitored for substance abuse, one of his urine samples in April 2011 was positive for marijuana and another sample was dilute. Jake also admitted to marijuana use in April 2011.

The superior court terminated Jake's parental rights at the conclusion of the trial. The court found by clear and convincing evidence that (1) Max was in need of aid as a result of mental injury, Jake's substance abuse, and Jake's personality disorder; (2) Jake had failed, within a reasonable time, to remedy his conduct that harmed Max; and (3) OCS had made reasonable efforts to provide family support services. The court also found that termination was in Max's best interests.

Jake appeals the termination decision on three grounds: its finding that Jake had not remedied his conduct, its finding that OCS made reasonable efforts to provide family support services, and its finding that termination was in Max's best interests.

## III.   STANDARD OF REVIEW

We review a trial court's factual finding on a parent's failure to remedy conduct for clear error.[3] Findings on whether a parent has " 'remedied the conduct or conditions . . . that place the child at substantial risk' . . . are factual determinations best made by a trial court after hearing witnesses and reviewing evidence."[4] We will find clear error only when we have "a definite and firm conviction that a mistake has been made."[5] The determination that OCS made reasonable efforts to reunify the family is a mixed question of law and fact.[6] When reviewing mixed questions of law and fact, we review factual questions for clear error and legal questions with our independent judgment.[7] The finding that termination of parental rights is in the child's best interest is a factual finding that we review for clear error.[8] Since a termination decision is a question of law, we review the decision de novo.[9]

---

[3]      *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010).

[4]      *Id.* (quoting AS 47.10.088(a)(2)(A)).

[5]      *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008 (Alaska 2011) (citing *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009)).

[6]      *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009) (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002)).

[7]      *Id.* (citing *A.M. v. State*, 945 P.2d 296, 304 n.10 (Alaska 1997)).

[8]      *Ralph H.*, 255 P.3d at 1008.

[9]      *See Barbara P.*, 234 P.3d at 1253 (citing *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004)).

## IV.  DISCUSSION

To terminate parental rights under AS 47.10.088 a trial court must find by clear and convincing evidence that (1) a child is in need of aid under one of the grounds listed in AS 47.10.011; (2) the parent failed to remedy the conduct or conditions that caused the child to be in need of aid or that returning the child to the parent would put the child at substantial risk of physical or mental injury; and (3) OCS has made reasonable efforts to provide family services.[10]  The court must also consider the best interests of the child.[11]

**A.  The Superior Court Did Not Err In Finding That Jake Failed To Remedy His Conduct Within A Reasonable Time.**

To terminate parental rights, AS 47.10.088(a)(2) requires a superior court to find by clear and convincing evidence that the parent

> (A)   has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
>
> (B)   has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury . . . .

The court may consider any fact related to the best interests of the child in assessing a reasonable time to remedy conduct, including:

> (1)   the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2)   the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3)   the harm caused to the child;

---

[10]   AS 47.10.088(a).

[11]   AS 47.10.088(c).

(4)     the likelihood that the harmful conduct will continue; and

(5)     the history of conduct by or conditions created by the parent.[12]

Based on these factors, the superior court determined that "[t]here is little likelihood [Max] can be returned to [Jake's] care within a reasonable time based on [Max's] age and his needs, and the type of therapy [Jake] would have to undertake before [Max] could be returned to the home."

### 1.    The superior court did not err in finding that Jake failed to remedy his personality disorder within a reasonable time.

Jake argues that he had remedied his conduct in a reasonable time and that the superior court ignored his progress in therapy. Jake reasons that the termination order relied on his personality disorder and probation violations rather than his behavioral improvements and "OCS's delay in referring Jake" to Dialectical Behavioral Therapy. Jake also contends that "the trial court's reliance on the risk of harm that would result from an abrupt removal [from a foster home] was improper" because "Jake was not seeking an immediate return of Max."

There is substantial evidence, however, that Jake cannot fulfill Max's urgent needs. First, the superior court found that Max's "reactive attachment disorder and his post[-]traumatic stress syndrome . . . [are] the direct result of [Jake's] behaviors." Second, the court determined that Jake is still unable to meet Max's immediate need for stability and emotional support. Third, the court found that even with extensive treatment, Jake has "less than [a] fifty percent chance of success."

The superior court heard testimony that Max is on the brink of disassociating and not coming back. The superior court relied on expert testimony and

---

[12]     AS 47.10.088(b).

noted that Max needs a consistent and supportive parent who can "read and respond to [him] emotionally." In making its findings, the superior court relied on Dr. Collins's testimony. Dr. Collins, a clinical psychologist, testified that Jake lacks empathy and focuses on himself over the needs of others. Jake prefers "to assert his control" over Max instead of showing empathy toward his son. The superior court also considered testimony from Max's caregiver that Jake drank every night he was home from working on the North Slope. The caregiver also testified that there was limited interaction between Jake and Max, and when there was, it was not "age-appropriate." The superior court thus determined "that [Jake's] personality disorder, as reflected in his past behaviors, was of such a nature and duration that it place[d] [Max] at substantial risk for further mental injury."

Dr. Collins evaluated Jake and observed Max and Jake together. The court noted that, according to Dr. Collins's testimony, Dialectical Behavioral Therapy would require "at least two years of intensive therapy, and possibly longer if Jake was working a slope schedule." Even with intensive therapy, Dr. Collins concluded that Jake would need ongoing therapeutic support. Since Jake is still not prepared to fulfill Max's needs for stability and support, the superior court reasonably found that Jake had not remedied his behavior in a reasonable time.

Finally, the superior court properly relied on the risk of disruptions to Max's stability, because Jake has a pattern of instability and disruptive probation violations. Jake's argument that this consideration was inappropriate due to the fact that Jake was not seeking immediate custody is misplaced. The superior court properly assessed whether returning Max to Jake would place Max "at substantial risk of . . . mental injury" under AS 47.10.088(a)(2)(B). The superior court also credited Dr. Mattheis's testimony that Max is emotionally fragile and reacted negatively to even a minor change in the visitation schedule. Based on Dr. Turner's testimony, the superior

court was concerned that Jake's inability to parent Max would persist because Jake's personality disorder would interfere with his ability to prioritize Max's needs. Since there was sufficient evidence that Jake had not remedied his personality disorder in a reasonable time, the superior court's finding was not clear error.

### 2. The superior court did not err in finding that Jake failed to remedy his substance abuse in a reasonable time.

Jake contends that "the evidence at trial demonstrated that substance use itself was not an issue." Since he was no longer on probation, Jake argues that his substance use would not disrupt his relationship with Max. The superior court, however, found that Jake's "habitual use of intoxicants has resulted in a substantial risk of harm to [Max]." The superior court acknowledged Jake's progress yet remained concerned that Jake's pattern of substance abuse would disrupt Max in the future. The superior court noted that Jake regularly consumed alcohol, in violation of his probation, "even though he knew that incarceration would lead to the termination of his parental rights." Moreover, the court stated "while this petition was pending and he knew he would be scrutinized regarding his use of illegal substances, he had a UA positive for marijuana and a dilute UA in April of 2011."

The superior court properly relied on Jake's history of relapses. Because Jake repeatedly consumed intoxicants, risking termination of his parental rights and further disruption to Max, the superior court determined that Jake's substance abuse presents a substantial risk of harm to Max. We therefore affirm the finding that Jake did not remedy his personality disorder or substance abuse in a reasonable time.

### B. The Trial Court Did Not Err In Finding That OCS Made Reasonable Efforts To Provide Family Support Services.

Jake argues that OCS's efforts "were insufficient as they did not address the root cause of the conduct that placed [Max] at risk of harm." Jake's theory is that

Dr. Turner's referral in 2007 for 24 sessions of therapy was not adequate to solve Jake's problems. Dr. Collins referred him, for similar symptoms, to Dialectical Behavioral Therapy in 2011. Jake argues that OCS should have provided a referral for Dialectical Behavioral Therapy earlier.

Before OCS terminates a parent's rights, OCS must make reasonable efforts to enable the safe return of the child to the family home.[13] Alaska Statute 47.10.086(a) defines reasonable efforts to include both identifying family support services that will assist the parent to remedy the problematic conduct and actively offering and referring the parent to these support services. Jake is correct that, to conclude whether reunification efforts were reasonable, we look at OCS's entire history with the family.[14]

The superior court determined that "OCS has engaged in reasonable efforts to provide family services designed to reunite [Max] with his parents." The court also observed that OCS continued to make reasonable efforts after the filing of the current petition. These efforts included "an updated substance abuse referral, including random UAs, setting up visitations with [Max], even while [Jake] was incarcerated, and providing for an updated psychological evaluation of [Jake]."

OCS made reasonable efforts by identifying and referring Jake to psychological evaluations and therapy that directly addressed the cause of harm to Max. Based on OCS referrals, Jake attended 46 sessions of therapy. Dr. Turner suggested the sessions focus on "anger management, consistency, empathy, and impulse control." Dr. Turner's referral directly addressed the causes of harm to Max, including Jake's decision-making and anger-management skills. In 2011 Dr. Collins recommended

---

[13]     AS 47.10.088(a)(3).

[14]     *See Burke P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 162 P.3d 1239, 1245 (Alaska 2007) (citing *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003)).

Dialectical Behavioral Therapy for Jake, even though Dialectical Behavioral Therapy is treatment for a Borderline Personality Disorder, which is not Jake's personality disorder. But a second assessment and referral to another type of therapy does not mean the initial therapy recommended was insufficient. Since OCS provided services to address Jake's personality disorder and substance abuse, the superior court did not err in finding that OCS made reasonable efforts to reunify the family.

### C. The Trial Court Did Not Err In Finding That Terminating Jake's Parental Rights Was In Max's Best Interests.

Alaska Statute 47.10.088(c) provides: "In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child." Here, the superior court found termination to be in Max's best interests because Jake's behavior "has and will continue to result in a substantial mental injury to [Max]."

Jake presents two challenges to the court's finding that termination was in Max's best interests. First, Jake argues that the superior court minimized the possible disruptive impact of termination and undervalued the bond between Jake and Max. Second, he claims the superior court "was wrong when it found that termination was in Max's best interests" because "there was no permanent placement plan for Max."

The superior court weighed both of Jake's concerns. According to Dr. Turner and Dr. Mattheis, "a disruption in foster care placement would have far fewer consequences for Max than a disruption caused by Jake's inability to parent Max." The court relied on Dr. Turner's assessment that the psychological disruption of separating Max and Jake would be minimal and explained "[n]one of the experts who testified believed [Jake] would be able to provide the consistency and the empathy that [Max] needs." The superior court found "that despite these services, [Jake's] personality disorder places [Max] at substantial risk of serious mental harm." The superior court did

not err in deciding that the termination of Jake's parental rights was in the best interests of Max based on his need for stability and support.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's termination of Jake's parental rights.